**DISTRICT OF COLUMBIA, Appellant,**

v.

**GROUP INSURANCE ADMINISTRATION, Appellee.**

**QUALITY DENTAL PLANS, INC., Appellant,**

v.

**GROUP INSURANCE ADMINISTRATION, Appellee.**

Nos. 92–CV–437, 92–CV–942 and 92–CV–477.

District of Columbia Court of Appeals.

Argued May 26, 1993.

Decided Oct. 28, 1993.

---

4

**6**

James C. McKay, Jr., Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellant, the District of Columbia.

Carol L. O'Riordan, with whom Vernon L. Strickland was on the brief, for appellant, Quality Dental Plans, Inc.

Paul J. Kiernan, with whom Richard L. Moorhouse and Stephen B. Shapiro were on the brief, for appellee, Group Ins. Admin., Inc.

Before FERREN and SULLIVAN, Associate Judges, and PRYOR, Senior Judge.

FERREN, Associate Judge:

The District of Columbia and Quality Dental Plans, Inc. (QDP) appeal from a trial court order, issued in favor of appellee Group Insurance Administration, Inc. (GIA), that preliminarily enjoined the District and QDP from performing a contract under which QDP was to administer the District's dental

and vision care benefits program for non-union employees. The District also appeals the trial court's order holding it in contempt and assessing fines for failure to comply with this injunction.

Because the preliminary injunction has since expired, appellants' direct challenge to the injunction is moot. Nevertheless, we examine the injunction's validity in the course of considering whether the trial court abused its discretion in holding the District in contempt. In doing so, we must determine whether the Superior Court has the authority to order emergency relief forcing the rebidding of a public contract while the underlying bid protest is still pending before the Contract Appeals Board (CAB or Board). Although we conclude that the Superior Court has this authority, this is an extraordinary power that should only be exercised in rare instances. The particular circumstances of this case did not warrant such extraordinary action. Accordingly, having determined that the underlying injunction was invalid, we reverse and remand this case for vacation of the civil contempt order against the District.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. The Contract Award Process

Since 1985, the District of Columbia government has provided dental and vision care benefits to all non-union employees. The District awarded the first contract to administer this program to GIA. On October 7, 1991, near the expiration of this first contract, the District issued a request for proposals (RFP) from qualified minority contractors [1] for a new one-year contract to administer the benefits program during calendar year 1992. The proposed contract also provided renewal options for four one-year

extensions. The deadline for the submissions was November 12, 1991.

Only two firms bid on the contract: GIA and QDP. A four-person committee, headed by the District Controller, evaluated GIA's and QDP's proposals, rating them on a 110-point scale that took into account company and staff qualifications, proposed service, quality of oral presentation, and contract price. The Committee gave GIA and QDP substantially similar ratings for their qualifications, proposed services, and oral presentations. There was, however, a significant difference between the two firms' price proposals. QDP offered a price of $2.00 per participant for the first year of operation, while GIA's proposed price was $3.35 per participant. The evaluation committee recommended that the District award the contract to QDP. As a result, on January 7, 1992, the District entered into a letter agreement with QDP, authorizing QDP to begin service in accord with the terms of its proposal and providing for the parties to enter into a definitive contract within 183 days. On the same day, the District notified GIA that it had not been selected.

### B. GIA's Bid Protest and Suit for Injunctive Relief

Ten days later, on January 17, 1992, GIA filed a bid protest with the CAB requesting the Board to cancel the District's contract with QDP. The protest alleged that: QDP lacked the required expertise to perform the contract; the District had failed to apply the evaluation criteria properly; QDP had a potential conflict of interest because it was also a provider of dental services; QDP intended to subcontract most of its vision services to non-minority businesses; the District had ignored GIA's proposed 20 percent discount

1. D.C.Code §§ 1–1141 to 1–1151 (1992), the Minority Contracting Act, requires District agencies to allocate their contracts so that 35 percent of the dollar volume of all construction and procurement contracts shall be given to local minority business enterprises. *See* D.C.Code § 1–1146(a)(1) & (2). The Act defines minority business enterprises as those in which "more than 50 percent of the ownership and control is held by individuals who are members of a minority, and of which more than 50 percent of the net profit

or loss accrues to members of a minority." D.C.Code § 1–1142(2). In *O'Donnell Const. Co. v. District of Columbia,* 295 U.S.App.D.C. 317, 963 F.2d 420 (1992), the United States Court of Appeals for the District of Columbia Circuit strongly suggested that the Act's provisions violate the constitutional guarantee of equal protection. *See, id.* at 321–25, 963 F.2d at 424–28. The parties in this case do not raise the issue of the Minority Contracting Act's constitutionality.

and therefore had misinterpreted GIA's actual price proposal.

On January 27, 1992, GIA filed an amended protest containing the additional claim that QDP was not a "responsible contractor" within the meaning of 27 DCMR § 2200.1 (1988) because QDP's Vice President, Thomas A. Parnham, had recently pled guilty to charges of conspiracy and failing to maintain proper records as required by the Employee Retirement Income Security Act, in violation of 18 U.S.C. § 371 (1988) and 29 U.S.C. §§ 1027, 1131 (1988).[2] Consequently, GIA alleged, the District's contract with QDP violated the District's own requirement that "[t]he contracting officer shall ... award contracts only to responsible contractors." 27 DCMR § 2200.1.

The District responded with an agency report to the CAB in which the District denied all of GIA's allegations and moved the Board to dismiss as untimely GIA's claim in its amended protest that QDP was not a responsible contractor. In an amended report, the District subsequently withdrew its motion to dismiss and submitted an affidavit from the District Controller stating that he had not become aware of Parnham's convictions until January 24, 1992, after he had entered into the letter agreement with QDP. The Controller averred that he had reviewed the government's statement of fact in support of Parnham's guilty pleas and had discussed the situation with QDP's president (Dr. Milton Bernard), Parnham, and Parnham's attorney. After this review, the Controller said, he had concluded that Parnham's guilty plea should not be imputed to QDP and that QDP remained a responsible contractor. In reaching this conclusion, the Controller had taken into account the following facts: (1) the convictions were for misdemeanors, not felonies; (2) the misdemeanors only involved a failure to disclose information; (3) Parnham had not been involved in taking or accepting illegally obtained funds; and (4) the convicting court had specifically informed Parnham that the convictions did not bar him from continuing with QDP in an administrative position.

While GIA's bid protest was pending before the CAB, GIA also filed a complaint in the Superior Court on February 13, 1992, requesting declaratory and injunctive relief, including a temporary restraining order, against the District. This complaint repeated most of the allegations set forth in GIA's bid protest to the CAB. In response, the District asserted that the trial court lacked jurisdiction to hear the complaint because GIA had failed to exhaust its administrative remedies in failing to wait for the CAB to render a decision on its bid protest. The District also claimed that, even if the court had jurisdiction to hear the case, GIA had failed to make the required showing of irreparable harm. Additionally, the District submitted the same affidavit from the Controller that it had filed with the CAB. QDP joined the District and moved for leave to intervene.

After a hearing, the trial court denied GIA's request for a temporary restraining order on February 28, 1992. Expressing his reluctance to interfere with the administrative process, the trial judge ruled that GIA should instead seek a stay of the contract from the CAB.

GIA then filed with the CAB an emergency motion for a stay of the contract. In an opinion issued on March 25, 1992, the CAB concluded that under D.C.Code § 1–1189.8(e) (1992) it had no authority to stay performance of a contract pending its decision on a

---

2. In its statement of facts in that case, the government alleged that Parnham had had a conversation with an undercover FBI agent in which Parnham had suggested that, as a representative of another health benefits administrator—not QDP—he would be willing to participate in a scheme that would overcharge an employer for an employee benefit plan and then channel the overpayment back to the consultant who had recommended the plan to the employer. Specifically, according to the FBI's undercover agent, Parnham had offered to set up an optical program at a cost of $6.50 per employee and then had said, "I don't mind addin' a buck to it to get Angie whoever he needs into it ... and I'll still take the four seventy-five and make money." Parnham never actually carried out this proposal, however. The United States District Court for the Northern District of Georgia sentenced Parnham to five years' probation and a $10,000 fine. Pursuant to 29 U.S.C. § 1111 (1988), the court also barred Parnham from having dealings with any employee benefit plan under ERISA for a period of three years.

bid protest. *See* 39 D.C.Reg. 4491, 4497, 4503 (1992).

Armed with the Board's decision, GIA returned to the trial court two days later. This time, the trial court concluded that GIA had exhausted its administrative remedies when the CAB denied GIA's request for a stay. Accordingly, the trial court agreed to hold a hearing on GIA's motion for a preliminary injunction to halt performance of QDP's contract with the District.

Testimony and evidence submitted at the hearing disclosed that Parnham had entered his guilty pleas in July 1991 and that Dr. Bernard, QDP's president, had known of this fact at that time. After reviewing the government's statement of facts in the case against Parnham, however, Dr. Bernard had concluded that Parnham's involvement "had been limited in duration and scope" and that Parnham could "continue to perform his duties on behalf of Quality Dental and conduct himself · with honesty and integrity." Accordingly, Parnham had participated fully in developing QDP's proposal to the District—a proposal in which he was named as a principal of QDP.

On April 1, 1992, the trial court issued an order enjoining the District and QDP from taking any further steps to implement the contract between them "except for transitioning to an emergency procurement pending the Contract Appeals Board's final decision." In reaching this decision, the trial court relied on the following findings of fact and conclusions of law.

First, the trial court concluded that, under 27 DCMR §§ 2200.3 and 2200.4 (1988), as well as under paragraphs 35(3), 37(1) and (2), and 38(2) of the District's RFP, QDP was obliged to disclose the fact of Parnham's convictions. The failure to reveal this information, the court said, cast doubt not only on Parnham's integrity but also on QDP's as well. Accordingly, the court concluded that there was a substantial likelihood that GIA would succeed in its protest to the CAB.

Second, the court found that the harm faced by GIA was comparable to the harm that QDP would suffer if enjoined from performing the contract. Absent an injunction, GIA would be forced to wait until the CAB rendered a decision, which would lead to a probable delay of about a year. As a result, GIA would lose 50 percent of its then-annual revenue and might be forced to lay off as many as four employees. On the other hand, an injunction would hurt QDP financially and force it to lay off a number of employees, but it would not threaten QDP's existence.

Third, the trial court found that the public interest overwhelmingly favored the granting of an injunction, so as to send a strong message that companies seeking to do business with the District could not profit from misrepresenting their qualifications.

Finally, the court determined that, given the CAB's disclaimer of authority to issue injunctive relief while an appeal was pending before it, GIA had exhausted its administrative remedies and had no adequate remedy available to it at law.

Both the District and QDP appealed from the trial court's order (Nos. 92–CV–437 & 92–CV–477).

## C. The Contempt Proceeding

After the trial court issued the injunction, the District moved for reconsideration. In denying that motion on May 13, 1992, the trial court also ordered that, "if the District does not take immediate steps to effect[ ] an emergency procurement, this Court will set the matter down for a show cause hearing why the District should not be held in contempt." On May 29, the District issued a new emergency RFP to administer its dental and vision care employee benefit program, and on June 26 the District selected Dental Providers, Inc. as the new program administrator. In the interim, however, GIA had petitioned the trial court on June 10 to issue an order to show cause why the District should not be held in contempt for failure to follow the trial court's order.

At a hearing on GIA's petition on June 19, Lorenzo McQueen, a manager in the District Controller's office, testified that the District had delayed in issuing a new RFP because it wanted to rewrite some of the specifications and to contact potential applicants who might be willing to bid on a short term contract.

Seven vendors had submitted proposals, and the review committee had made a recommendation on June 17. At the time of the hearing, McQueen was conducting a background check on the winning provider.

Later, at a hearing on July 13, the District Controller corroborated much of McQueen's testimony. In particular, the Controller said that he had felt it was important, for the sake of potential bidders, to incorporate into the new RFP a statement of the situation under which this RFP was being issued. The Controller also admitted, however, that even though the District's original letter agreement with QDP had expired as of July 12 (the 183 days had run), he had signed a contract extension permitting QDP to continue to administer the District's benefit plan, so as to allow the new administrator, Dental Providers, sufficient time to gear up its operation.

On July 22, 1992, the trial court issued an order holding the District in civil contempt for failure to comply with its injunction. The trial court found, first, that the District was still using QDP's services as of July 13, 1992, notwithstanding the injunction. Second, the court found that the District could have completed the emergency procurement process and installed a new benefits administrator by May 22. Finally, the court concluded that the District had failed to demonstrate either of the two recognized defenses to civil contempt, i.e., substantial compliance or inability to comply. The court ordered the District to pay the sum of $1,500 per day to GIA for each day that the District had continued to use QDP's services between May 22 and July 13, or a total of $78,000. The court also ordered the District to pay GIA $2,000 for each day after July 13 that the District continued to use QDP. Finally, the court re-quired the District to pay GIA's attorney fees incurred in connection with the motion for order to show cause.

The District also appeals from this order (No. 92–CV–942).

## D. The Contract Appeals Board Decision

On September 2, 1992, the CAB issued a decision denying GIA's bid protest in all respects. *See* 40 D.C.Reg. 4485 (1992). The Board reached the following conclusions: (1) the District's review committee had not misapplied the RFP's criteria in evaluating GIA's and QDP's proposals; (2) GIA's conflict of interest claims were too speculative to justify disturbing a contract award; (3) GIA's allegation that QDP was planning to subcontract administration of vision care benefits was unsupported by the evidence; (4) GIA's proposed 20 percent discount did not conform to the RFP's request for a single fixed price, and thus the committee did nothing unreasonable in refusing to give it full consideration; and (5) the Controller's determination that QDP was responsible was entitled to deference, absent evidence that procuring officials had a specific, malicious intent to harm GIA. *See id.* at 4508–19.

GIA has since filed an action in Superior Court for review of the CAB decision. That decision is not before us in this appeal.

## II. THE ISSUES ON APPEAL

Because of the peculiar procedural posture of this case, we begin our analysis by asking what issues are properly before us on appeal.

 Ordinarily, this court has jurisdiction to hear an appeal from the grant of a preliminary injunction.[3] *See* D.C.Code § 11–

3. The record is somewhat confusing as to whether the trial judge regarded his order as a preliminary or permanent injunction. On the second day of hearings on GIA's motion for injunctive relief, the trial judge asked counsel for all parties if it would be "agreeable to make this Preliminary Injunction Hearing also the Permanent Injunction Hearing." In the text of the order, the trial judge also stated that "[b]y agreement of the parties the trial on the merits was advanced and consolidated with the hearing on the application for a preliminary injunction." But, in ruling on GIA's motion, the trial judge considered GIA's likelihood of success on the merits before the CAB and issued the injunction "pending the Contract Appeals Board's final decision." The trial judge also stated in the order that "[i]ssuance of an injunction ... will cost QDP this contract until after the CAB acts." Thus, it appears that the trial judge intended the injunction to last only until the CAB had arrived at its decision. Notwithstanding his statements about hearing the case on the merits, the trial judge did not try to determine the merits of GIA's bid protest, leaving that task to the CAB. In light of these factors, we deem the trial court's order a prelimi-

721(a)(2)(A) (1989); *Wieck v. Sterenbuch,* 350 A.2d 384, 386 n. 1 (D.C.1976). In this case, however, the CAB's decision denying GIA's bid protest on September 2, 1992, apparently terminated the effective period of the trial court's injunction, insofar as the court's order directed the District to take steps to rebid the contract only "pending the Contract Appeals Board's final decision." Consequently, appellants' challenge to the preliminary injunction has become moot. *See, e.g., Certified Grocers of Ill. v. Produce Employees Union, Local 703,* 816 F.2d 329, 330–32 (7th Cir.1987) (where preliminary injunction lasted only until arbitrator's decision, decision rendered appeal of injunction moot); *Kitlutsisti v. ARCO Alaska, Inc.,* 782 F.2d 800, 801 (9th Cir.1986) (appeal from preliminary injunction prohibiting drilling unless permitted by Environmental Protection Agency rendered moot by issuance of permit); *see generally Vaughn v. United States,* 579 A.2d 170, 175 n. 7 (D.C.1990). Although we, unlike the federal courts, are not bound by the "case or controversy" requirement of Article III of the Constitution, we have adopted this requirement for prudential reasons, and therefore we will not normally decide questions that have become moot. *See Atchison v. District of Columbia,* 585 A.2d 150, 153 (D.C.1991); *Banks v. Ferrell,* 411 A.2d 54, 55–56 (D.C.1979). Accordingly, we dismiss the appeals in Nos. 92–CV–437 and 92–CV–477.

■ That is not to say, however, that this case as a whole has become moot. The District's liability for the contempt fines it was ordered to pay to GIA, the point at issue in No. 92–CV–942, remains a live controversy

nary injunction. *See* 42 Am Jur.2d *Injunctions* § 9 (1969) ("preliminary ... injunctions ... are provisional remedies obtainable before a hearing on the merits, granted to preserve the subject in controversy ...; ... permanent injunctions ... are such as can be granted only at a final hearing on the merits, and ... are usually perpetual in effect").

4. Although QDP filed a memorandum below opposing GIA's show cause motion, QDP did not attempt to join the District's appeal from the trial court's contempt order.

5. *See also United States v. United Mine Workers,* 330 U.S. 258, 295, 67 S.Ct. 677, 696–97, 91 L.Ed. 884 (1947) ("The right to remedial relief

between the District and GIA.[4] *See University of Texas v. Camenisch,* 451 U.S. 390, 393–94, 101 S.Ct. 1830, 1832–33, 68 L.Ed.2d 175 (1981). Furthermore, in reviewing the trial court's civil contempt order, we may properly consider the validity of the underlying injunction. "The purposes of *civil* contempt orders are to coerce compliance with the underlying order and/or to compensate the complainant for loss sustained by disobedience. Accordingly, civil contempt may be defended on the ground that the underlying order was erroneously issued." *Blocksom & Co. v. Marshall,* 582 F.2d 1122, 1124 (7th Cir.1978).[5]

In this case, the District contends that the trial court's contempt order was in error because the underlying injunction was invalid. Specifically, the District argues that (1) the trial court lacked authority to issue the injunction, and (2) even if the trial court had the authority to award such relief, it abused its discretion in doing so in the particular circumstances of this case. In addition, the District contends that, in any event, the trial court's award of compensatory damages to GIA was not supported by any evidence of actual losses.

## III. THE TRIAL COURT'S AUTHORITY TO GRANT PRELIMINARY RELIEF

■ The District argues, first, that the trial court lacked authority to issue the injunction while GIA's bid protest was still pending before the CAB. Essentially, the District's argument has three themes. One theme involves subject matter jurisdiction:

[for civil contempt] falls with an injunction which events prove was erroneously issued, and *a fortiori* when the injunction or restraining order was beyond the jurisdiction of the court.") (citations omitted); *McLean v. Central States Southeast and Southwest Areas Pension Fund,* 762 F.2d 1204, 1210 (4th Cir.1985); *I.T.T. Community Dev. Corp. v. Barton,* 569 F.2d 1351, 1356 (5th Cir.1978); *Latrobe Steel Co. v. United Steelworkers,* 545 F.2d 1336, 1342–48 (3d Cir.1976); 13A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3537, at 344 (1993 Supp.). In *D.D. v. M.T.,* 550 A.2d 37, 44 (D.C.1988), we referred to substantial compliance and inability to comply as the only recognized defenses in civil contempt proceedings. In that case, however, the validity of the underlying order was not at issue.

the District argues that, until the CAB rendered a decision on GIA's bid protest, the trial court lacked jurisdiction to hear GIA's suit for injunctive relief because the applicable statute designates the CAB as the exclusive hearing tribunal for bid protests.[6] A second theme raises the issue of standing: the District asserts that GIA had no right to sue for any relief other than the remedies expressly provided by statute. The third theme concerns the doctrine of exhaustion of administrative remedies: the District argues that the court should not have acted on GIA's behalf because GIA had not yet exhausted its administrative remedies. Although the District tends to interweave these three themes in its argument, we distinguish them and consider them one at a time for the sake of clarity.

### A. The Superior Court's Subject Matter Jurisdiction

In 1985, the Council of the District of Columbia established the CAB in its present form under the District of Columbia Procurement Practices Act, D.C.Code §§ 1–1181.1 to 1–1192.6 (1992 & Supp.1993).[7] D.C.Code § 1–1189.3 (1992) sets forth the CAB's jurisdiction over bid protests as follows:

> The Board shall be the *exclusive hearing tribunal* for, and shall have jurisdiction to review and determine de novo:
>
> (1) Any protest of a solicitation or award of a contract addressed to the Board by any actual or prospective bidder or offeror, or a contractor who is aggrieved in connection with the solicitation or award of a contract....

(Emphasis added.) The District argues that this statute "gives the CAB the exclusive jurisdiction to hear and resolve [bid] protests" and that the Superior Court accordingly has jurisdiction to intervene only after the CAB has rendered a decision. GIA responds that, notwithstanding the statutory language, the Superior Court's general equity jurisdiction gave the court authority to hear GIA's claims even though GIA's protest was still pending before the CAB.

For reasons that will become evident momentarily, we begin our analysis by considering the nature and sources of the Superior Court's subject matter jurisdiction. In 1970, Congress passed the District of Columbia Court Reorganization Act, Pub.L. No. 91–358, 84 Stat. 473 (1971), which conferred upon our "local courts ... powers analogous to those of state courts" and gave "the Superior Court plenary jurisdiction over civil matters brought in the District of Columbia" via D.C.Code § 11–921 (1989). *Reichman v. Franklin Simon Corp.*, 392 A.2d 9, 12 (D.C. 1978). Thus, "[a]s presently constituted, the Superior Court is no longer a court of *limited* jurisdiction, but a court of general jurisdiction with the power to adjudicate any civil action at law or in equity involving local law." *Andrade v. Jackson,* 401 A.2d 990, 992 (D.C. 1979) (emphasis in original).

Only Congress has the authority to alter this grant of general jurisdiction to the Superior Court. D.C.Code § 1–233(a)(4) (1992) specifically prohibits the Council of the District of Columbia from enacting "any act, resolution, or rule ... relating to organization and jurisdiction of the District of Colum-

---

**6.** GIA asserts that the District conceded at the proceedings below that the Superior Court had jurisdiction to hear GIA's suit for injunctive relief even though GIA's bid protest was still pending before the CAB. Whether the District actually intended to concede this point is unclear from the record. It is true that, in the course of oral argument before the trial court on GIA's motion for a temporary restraining order, counsel for the District said, "I am not suggesting that the procurement practices ... [were] intended to divest the Superior Court of equity jurisdiction." But District counsel also emphasized repeatedly that the CAB was the exclusive forum for resolution of bid protests. In any event, we will consider the District's jurisdictional argument on appeal, since this court adheres to the traditional rule

that a "'question of subject matter jurisdiction may be presented by any interested party at any time ... even for the first time on appeal.'" *King v. Kidd,* Nos. 90–CV–1621, 91–CV–283, slip op. at 8–11 & n. 4 (Aug. 26, 1993) 1993 WL 326062.

**7.** *See* 32 D.C.Reg. 7396, 7422–23 (1985); D.C.Code § 1–1189.1 (1992). The CAB replaced an earlier contract appeals board created by executive order. *See Jones & Artis Const. Co. v. Contract Appeals Bd.,* 549 A.2d 315, 322 (D.C. 1988); COMMITTEE ON GOVERNMENT OPERATIONS, COUNCIL OF THE DISTRICT OF COLUMBIA, REPORT ON BILL 6–191, "DISTRICT OF COLUMBIA PROCUREMENT PRACTICES ACT OF 1985," 5 (1985).

bia courts." Thus, the Council may not expand or reduce the jurisdiction of the local courts. *See Jones & Artis Const. Co. v. Contract Appeals Board,* 549 A.2d 315, 318 (D.C.1988); *Capitol Hill Restoration Soc'y v. Moore,* 410 A.2d 184, 188 (D.C.1979); *Columbia Realty Venture v. District of Columbia Hous. Rent Comm'n,* 350 A.2d 120, 124 (D.C. 1975).

█ The Procurement Practices Act was enacted by the Council, not initiated by Congress.[8] The Act therefore lacked the authority to alter the existing jurisdiction of the Superior Court. Consequently, before examining D.C.Code § 1–1189.3, which governs the CAB's authority over bid protests, we must first consider whether, as part of its general equity jurisdiction and entirely apart from the commands and implications of § 1–1189.3, the Superior Court may hear a suit for injunctive relief in relation to a bid protest, even though the underlying protest is still pending before the appropriate agency review board.

█ "This court has held that [D.C.Code] § 11–921(a)(6) permits a party 'aggrieved' by a decision of a District of Columbia agency to initiate an appropriate action in the Superior Court for equitable relief, unless this court has jurisdiction under the DCAPA [District of Columbia Administrative Procedure Act, D.C.Code §§ 1–1501 to 1–1511 (1992)] to consider a direct appeal." *Speyer v. Barry,* 588 A.2d 1147, 1159-60 (D.C.1991); *see also Capitol Hill Restoration Soc'y,* 410 A.2d at 188; *Columbia Realty,* 350 A.2d at 123. D.C.Code § 1–1510(a) allows the District of Columbia Court of Appeals to hear a direct appeal from an agency decision only in a "contested case," *i.e.,* "a proceeding in which 'the legal rights, duties, or privileges of specific parties are required by law . . ., or by constitutional right,' to be determined after a trial-type hearing." *Jones & Artis,* 549 A.2d at 318 (quoting D.C.Code § 1–1502(8)). Because a bid protest is not a contested case within the meaning of the DCAPA, a disap-

pointed bidder seeking relief from a decision on a bid protest by the CAB must resort in the first instance to the Superior Court. *See id.; Network Technical Servs. v. District of Columbia Data Co.,* 464 A.2d 133, 136 (D.C. 1983).

█ Citing *Jones & Artis,* the District concedes in its brief that the Superior Court has the authority to review the CAB's final decision on a bid protest. The District contends, however, that the trial court "has no authority to interfere with a pending administrative proceeding other than its authority under the All Writs Act, 28 U.S.C. § 1651, to preserve its jurisdiction." The qualification in the District's argument is highly significant, for, indeed, the All Writs Act does provide the Superior Court with jurisdictional authority, albeit in rare circumstances, to issue emergency relief pending the resolution of agency proceedings.

The All Writs Act provides that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a) (1988). In *FTC v. Dean Foods Co.,* 384 U.S. 597, 603–05, 86 S.Ct. 1738, 1742, 16 L.Ed.2d 802 (1966), the Supreme Court held that this act empowered a federal court of appeals to issue a preliminary injunction to prevent a merger until the Federal Trade Commission had determined its legality. Exercise of the power to issue writs in aid of jurisdiction, the court said, " 'is in the nature of appellate jurisdiction' . . . and extends to the potential jurisdiction of the appellate court where an appeal is not then pending but may be later perfected." *Id.* at 603, 86 S.Ct. at 1742 (quoting *Ex parte Crane,* 30 U.S. 190, 193 (5 Pet.), 8 L.Ed. 92 (1832) and citing *Ex parte Bradstreet,* 32 U.S. 634 (7 Pet.), 8 L.Ed. 810 (1833)). Furthermore, the Court observed, the power to issue preliminary relief also covers cases involving administrative agencies:

**8.** The Procurement Practices Act was introduced before the Council of the District of Columbia as Bill 6–191 on March 26, 1985. The Council adopted the bill on first and second readings on November 5 and 19, 1985, the Mayor signed it on December 3, 1985, and, following expiration of the period for Congressional review, the Act became effective on February 21, 1986. *See* 33 D.C.Reg. 1291 (1986).

decisions of this Court "have recognized a limited judicial power to preserve the court's jurisdiction or maintain the *status quo* by injunction pending review of an agency's action through the prescribed statutory channels.... Such power has been deemed merely incidental to the court's jurisdiction to review final agency action...."
*Id.* at 604, 86 S.Ct. at 1742 (quoting *Arrow Trans. Co. v. Southern Ry. Co.*, 372 U.S. 658, 671 n. 22, 83 S.Ct. 984, 991 n. 22, 10 L.Ed.2d 52 (1963)).

 We recently recognized this doctrine in the context of appellate court review of contested cases in *Capitol Hill Hosp. v. District of Columbia State Health Planning & Dev. Agency*, 600 A.2d 793 (D.C.1991). Citing *Dean Foods*, we observed that, in a contested case over which we would eventually have direct reviewing authority, we would also have the authority to issue emergency relief to preserve the status quo while administrative review is still pending. *See id.* at 799. As with federal courts, the source of our authority to issue temporary relief pending administrative review in such a case is the All Writs Act. *See id.; cf. Morrow v. District of Columbia*, 135 U.S.App.D.C. 160, 167, 417 F.2d 728, 735 (1969) (holding that District of Columbia Court of Appeals, as then constituted, had power to issue extraordinary writs in aid of jurisdiction under All Writs Act).

 Because the District of Columbia Superior Court, like this court, was created by Congress, it follows that the All Writs Act applies equally to the Superior Court. *See Christian v. United States*, 394 A.2d 1, 43–44

(D.C.1978), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979). Therefore, like this court, the Superior Court must also have the power to issue emergency relief pending the completion of administrative proceedings in cases where, in the first instance, review would lie in the Superior Court.[9] Thus, because the Superior Court has jurisdiction to review the CAB's decisions in bid protests, as the District concedes, the Superior Court also possesses the power under the All Writs Act to issue temporary relief to a disappointed bidder even though the CAB has not yet issued a decision.

 Nothing in the Procurement Practices Act can affect this power because, as we have already noted, the Council, in adopting the Act, lacked authority to alter the jurisdiction of the Superior Court as Congress defined it.[10] With this said, however, we also note that we see not necessary inconsistency between D.C.Code § 1–1189.3 and the Superior Court's authority to issue emergency relief pending the outcome of CAB proceedings.

 In concluding as we do that the Superior Court has the power to issue emergency relief by virtue of its jurisdiction to review CAB decisions, we do not question the CAB's role as "exclusive hearing tribunal" for all bid protests. We recognize that, in so designating the CAB, the Council apparently rejected other procurement schemes that allow a disappointed bidder to resort to the trial court either instead of, or in addition to,

9. We also note that, in the federal court system, the federal district courts have similar power under the All Writs Act to issue preliminary injunctive relief to preserve the status quo pending the completion of agency proceedings in cases where they, rather than the courts of appeals, would have the power of direct review. *See Sheehan v. Purolator Courier Corp.*, 676 F.2d 877, 884 (2d Cir.1982); *In re Uranium Antitrust Litigation*, 617 F.2d 1248, 1259 (7th Cir.1980).

10. It might be argued that curtailment of the Superior Court's power to issue injunctions pending a CAB decision would not be a direct infringement upon the Superior Court's jurisdiction per se, but only a withdrawal of the Superi-

or Court's specific power under the All Writs Act. Such an argument is unavailing, however, insofar as *Dean Foods* and the decisions it relied upon treated the power to issue special writs in aid of jurisdiction as "in the nature of" or "merely incidental" to jurisdiction. *Dean Foods*, 384 U.S. at 603–04, 86 S.Ct. at 1742–43; *see also Morrow*, 135 U.S.App.D.C. at 165, 417 F.2d at 733 (extraordinary writs "are considered to be tools inherent in an appellate court's power to supervise a lower court"). We do not believe that the Council of the District of Columbia has authority to withdraw a power that Congress gave to the local courts and that is so closely tied to their jurisdiction.

seeking administrative review.[11] We also appreciate that CAB members have "experience in the areas of procurement and contract law," D.C.Code § 1–1189.2(b) (1992), which gives them particular expertise in compiling and interpreting the voluminous and highly technical factual records that are typically involved in a public procurement dispute.

Accordingly, we do not hold that the Superior Court's power to grant emergency relief gives it the authority to function as a competitor of the CAB or to ignore the CAB's findings. Nothing in this opinion is intended to authorize the Superior Court as an alternative hearing tribunal. On the contrary, the Superior Court still owes the CAB deference as the primary fact-finder. *See* D.C.Code § 1–1189.8(d) (1992) ("A determination of an issue of fact by the Board [in a bid protest] shall be final and conclusive unless arbitrary, capricious, fraudulent, or clearly erroneous."); *see also Kegley v. District of Columbia*, 440 A.2d 1013, 1018 (D.C. 1982) (where review of administrative proceeding properly lies in Superior Court, Superior Court must apply same standard of

11. The American Bar Association's Model Procurement Code gives a disappointed bidder a choice between either the courts or the appeals board to resolve a bid protest:

> Unless an action has been initiated previously in [the designated court or courts] for essentially the same cause of action, or unless within [15] days after the action is brought before the Procurement Appeals Board, written objection is made by either the aggrieved bidder, offeror, or contractor, prospective or actual, or the [Attorney General] [Chief Procurement Officer of head of a Purchasing Agency with the concurrence of the Attorney General], the Board shall have jurisdiction to review and determine de novo:
>
> (a) any protest of a solicitation or award of a contract addressed to the Board by an aggrieved actual or prospective bidder or offeror, or a contractor....

Model Procurement Code for State and Local Governments, § 9–505 (1979) (bracketed material in original). The similarities in language between this section of the Model Code and D.C.Code § 1–1189.3 suggest that the Council was aware of the Model Code and deliberately rejected this provision for alternative jurisdiction over a bid protest.

Under federal law, a disappointed bidder may resort to several remedies simultaneously:

> A protesting party can look to several adjudicators for consideration of his protest. For example, he [or she] may begin with the contracting agency by asking the contracting officer to decide the matter or he may ask the Comptroller General [of the General Accounting Office] to provide a decision prior to award.... Often a protestor will seek and simultaneously commence an action in a federal court because in the past at least, the likelihood of obtaining relief from the GAO in the form of stopping the procurement and forcing reprocurement by the agency has been rather slim.

W. Noel Keyes, Government Contracts Under the Federal Acquisition Regulation § 33.2, at 459 (1986); *see also* 31 U.S.C. § 3556 (Supp. IV 1986) ("This subchapter does not give the Comptroller General exclusive jurisdiction over protests and nothing contained in this subchapter shall affect the right of any interested party to file a protest with the contracting agency or to file an action in a district court of the United States or the United States Claims Court.")

Because the federal scheme allows a bid protester to seek relief from both the courts and the GAO simultaneously, we do not rely on federal procurement law in reaching our conclusion that the Superior Court has jurisdiction to grant interim relief. We note, however, that our conclusion is consistent with federal procurement caselaw. For instance, in *Wheelabrator Corp. v. Chafee*, 147 U.S.App.D.C. 238, 455 F.2d 1306 (1971), the United States Court of Appeals for the District of Columbia Circuit held that a federal district court had jurisdiction to issue a preliminary injunction while a protest was still pending before the GAO:

> Plaintiff's application to the GAO ... did not preclude its subsequent application to the District Court, while the matter was still pending in GAO, for injunctive relief to prevent irreparable injury from the imminent bid opening. Under the doctrine of primary jurisdiction, a court may entertain an action for permanent relief and defer its consideration of the merits until an agency "with special competence" in the field has ruled on the issues, if necessary maintaining the status quo pendente lite with injunctive relief avoiding irreparable injury pending such agency consideration....

> The preliminary injunction by a court pending GAO determinations may provide a felicitous blending of remedies and mutual reinforcement of forums, since even the relatively expeditious GAO ... may run into delays on decisions that undercut effectiveness of relief.... The preliminary injunction may be used to preserve the status quo and while securing for the court the benefit of the GAO's expertise. Where a court has warrant for issuing an injunction pending GAO determination it may be able to obviate the objection sometimes leveled at GAO's procedure, that the time required sometimes renders the matter moot prior to GAO's determination.

review as Court of Appeals would apply to review of contested case under DCAPA). Furthermore, as we set forth in detail in Part IV.A., the circumstances in which the Superior Court is entitled to exercise its jurisdiction to issue temporary relief pending the completion of agency proceedings will be extremely rare.

### B. Standing

[20] In another argument against the trial court's authority to issue the preliminary injunction, the District cites *Perkins v. Lukens Steel*, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940), for the proposition that "it is a basic principle of government contract law that an unsuccessful bidder has no right to challenge a government contract other than the rights given ... by statute." Thus, the District argues, GIA may not resort to any forum other than the CAB in the first instance, nor may GIA sue for preliminary relief, because such relief is not available from the CAB under its governing statutes. *See* D.C.Code §§ 1–1189.3,–1189.8(e)(1) (1992).[12] We reject this argument.

In citing *Lukens Steel*, the District is apparently attempting to revive the old notion that a party has standing to sue for relief from an adverse administrative decision only where the agency has invaded a specific legal right, either founded in common law or specifically conferred by statute, that belongs to that party.[13] But that is no longer the Supreme Court's test for standing to challenge an administrative agency's decision, nor is it ours.

 In *Association of Data Processing Serv. Orgs., Inc. v. Camp (ADAPSO)*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the Supreme Court specifically rejected the legal interest test as a condition of standing to sue for relief from agency action, stating that the legal interest test "goes to the merits," *id.* at 153, 90 S.Ct. at 830, and is "a matter quite distinct from the problem of standing," *id.* at 153 n. 1, 90 S.Ct. at 829 n. 1. Instead, the Court announced a broader test for standing. As summarized and adopted by this court in *Lee v. District of Columbia Bd. of Appeals & Review*, 423 A.2d 210 (D.C. 1980), the *ADAPSO* test requires that

> in order to seek review of an administrative agency's decision, (1) the petitioner must allege that the challenged action has caused him injury in fact; (2) the interest sought to be protected by the petitioner must be arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question; and (3) there must be no clear legislative intent to withhold judicial review either from the class of persons or in the type of case involved.

*Lee*, 423 A.2d at 216 (citing *ADAPSO*, 397 U.S. at 152, 153, 156, 90 S.Ct. at 829, 830, 831); *see also Dupont Circle Citizens Ass'n v. Barry*, 455 A.2d 417, 421 (D.C.1983); *Basiliko v. District of Columbia*, 283 A.2d 816, 818 (D.C.1971). For example, using this test in *ADAPSO* the Supreme Court held that a data processors association had standing to challenge a ruling by the Comptroller of the Currency that banks could make data processing services available to other banks and bank customers. *See ADAPSO*, 397 U.S. at 158, 90 S.Ct. at 832. Such a party would have lacked standing under the old legal interest test. *See id.* at 153, 90 S.Ct. at 829–30.

 In subsequent cases, the Supreme Court added further refinements to this test

---

*Id.* at 248, 455 F.2d at 1316 (citations omitted).

**12.** D.C.Code § 1–1189.8(e)(1) provides in part: "In addition to other relief, except enjoining a contract award, the Board may order, when a protest is sustained, that the contract awarded under the solicitation be terminated for the convenience of the District." As we noted above, the CAB ruled that this provision prohibited it from granting a preliminary injunction on GIA's behalf. *See* 39 D.C.Reg. at 4497, 4503.

**13.** In *Lukens Steel*, seven iron and steel producers obtained a temporary injunction enjoining

federal officials from requiring that government contractors pay their employees a minimum wage. The Supreme Court reversed, holding that federal law requiring public advertising of federal contracts was a "self-imposed restraint" and "was not intended to be a bestowal of litigable rights upon those desirous of selling to the Government." *Lukens Steel*, 310 U.S. at 127, 60 S.Ct. at 877. Because the steel producers could not show that the government had violated any other legal right belonging to them, the Court concluded that the producers lacked standing to sue for relief. *Id.* at 132, 60 S.Ct. at 879.

for standing, which we have also incorporated into our own caselaw. Thus, we have said the plaintiff must also show "that the injury fairly can be traced to the challenged action, and that it is likely to be redressed by a favorable decision." *Speyer*, 588 A.2d at 1160 (quoting *Community Credit Union v. Federal Express Servs. Corp.*, 534 A.2d 331, 333 (D.C.1987)); *see Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 41–42, 96 S.Ct. 1917, 1924, 1925–26, 48 L.Ed.2d 450 (1976). Furthermore, "a plaintiff may assert only its own legal rights [and] may not attempt to litigate generalized grievances." *Speyer*, 588 A.2d at 1160 (quoting *Community Credit Union*, 534 A.2d at 333); *see Valley Forge*, 454 U.S. at 474–75, 102 S.Ct. at 759–60.[14]

■ Applying these standards, the federal courts have typically held that disappoint-

ed bidders for a contract with the federal government have standing to sue for relief.[15] We see no reason to treat GIA differently under our own local law.

■ First, GIA had unquestionably suffered injury in fact. Having lost a substantial contract that it otherwise stood a fair chance of winning, GIA claimed that it faced "loss of key employees; threat to the viability of the company; and loss of marketplace credibility." "The unsuccessful bidder meets the 'injury in fact' prong of the test because 'the economic injury he [or she] suffers ... is manifest. No serious doubt exists that a disappointed bidder suffers economic loss by virtue of his [or her] inability to obtain the contract at issue.'" *Choctaw Mfg. v. United States*, 761 F.2d 609, 616 (11th Cir.1985) (quoting *Hayes Int'l Corp. v. McLucas*, 509 F.2d 247, 255 (5th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975)) (brackets omitted).

**14.** In *Valley Forge*, the Supreme Court classified the elements of injury in fact, causation, and redressability as constitutionally compelled prerequisites for standing, distinguishing them from "prudential principles" such as the zone-of-interest requirement or avoidance of generalized grievances. *See Valley Forge*, 454 U.S. at 471–72, 474–75, 102 S.Ct. at 757–59, 759–60. In many of its decisions, the Supreme Court has focused primarily on these constitutional prerequisites for standing, neglecting the zone-of-interest test. *See, e.g., Lujan v. Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); 4 KENNETH C. DAVIS, ADMINISTRATIVE LAW TREATISE § 24:17, at 273 (2d ed. 1983) ("As of 1982, the 'zone' test is sometimes used, but most of the time it is not, and no guides exist as to whether or when it is used."). At other times, however, the Court has emphasized the zone-of-interest requirement. *See Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 394–400, 107 S.Ct. 750, 754–757, 93 L.Ed.2d 757 (1987). In any event, we continue to include the zone-of-interest requirement as part of our test for standing. *See Speyer*, 588 A.2d at 1160.

**15.** *See, e.g., Irvin Indus. Canada, Ltd. v. United States Air Force*, 288 U.S.App.D.C. 111, 115 n. 45, 924 F.2d 1068, 1072 n. 45 (1990); *Choctaw Mfg. v. United States*, 761 F.2d 609, 615–16 (11th Cir.1985); *Motor Coach Indus., Inc. v. Dole*, 725 F.2d 958, 962–64 (4th Cir.1984); *CACI, Inc.—Fed. v. United States*, 719 F.2d 1567, 1572–75 (Fed.Cir.1983); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 717–23 (2d Cir.1983); *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1265–66 (5th Cir.1978); *Airco, Inc. v. Energy Research*

*& Dev. Admin.*, 528 F.2d 1294, 1296 (7th Cir. 1975); *Armstrong & Armstrong, Inc. v. United States*, 514 F.2d 402, 403 (9th Cir.1975); *Merriam v. Kunzig*, 476 F.2d 1233, 1241–43 (3d Cir.), *cert. denied*, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973). *But see Peoples Gas, Light & Coke Co. v. United States Postal Serv.*, 658 F.2d 1182, 1200 (7th Cir.1981); *Cincinnati Elec. Corp. v. Kleppe*, 509 F.2d 1080, 1086 (6th Cir.1975).

*Scanwell Labs., Inc. v. Shaffer*, 137 U.S.App. D.C. 371, 424 F.2d 859 (1970), decided before *ADAPSO*, provided an early rationale for this line of holdings. In *Scanwell*, the United States Court of Appeals for the District of Columbia Circuit rejected the reasoning of *Lukens Steel* in holding that a disappointed bidder on a federal contract had standing. *Lukens Steel* was not dispositive, the court said, because in the interim Congress had passed both the Administrative Procedure Act and amendments to federal contract law, both of which evinced an intent to afford broader review of government actions to persons aggrieved by agency action. *Id.* at 380, 384, 424 F.2d at 868, 872. While acknowledging that a disappointed bidder has no right to have the contract actually awarded to it, the court pointed out, that the public nevertheless has an interest in allowing a disappointed bidder to sue to enforce the law as a "private attorney general." *Id.* at 376, 424 F.2d at 864. "If there is arbitrary or capricious action on the part of any contracting official," the court asked, "who is going to complain about it, if not the party denied a contract as a result of the alleged illegal activity?" *Id.* at 378–79, 424 F.2d at 866–67.

Second, that injury was fairly traceable to the District's alleged breach of its own procedures and regulations in (1) initially awarding the benefits administration contract to QDP and (2) continuing the contract with QDP after learning of Parnham's convictions. Of course, GIA was not entitled to this contract. But it was entitled to a fair award process. "Doing business with the Government has become an important part of American economic life; arbitrary deprivation of government contracts on non-discretionary grounds is a serious wrong...." *B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 719 (2d Cir.1983). Thus, a "disappointed bidder need demonstrate only that if its bid had been fairly and honestly considered, 'there was substantial chance that [it] would receive an award....'" *CACI, Inc.—Fed. v. United States,* 719 F.2d 1567, 1574 (Fed.Cir.1983) (quoting *Morgan Business Assocs. v. United States,* 619 F.2d 892, 895, 223 Ct.Cl. 325 (1980)). As the previous administrator and only other bidder, GIA had a substantial chance of winning the new benefits administration contract. *See id.* at 1575 (disappointed bidder that was one of six companies qualified to submit final offer had standing to challenge award).

Third, the claimed injury could be redressed by court action. "An injunction barring the award would correct this alleged injury since it would require the government ... to repeat the bidding process under circumstances that would eliminate the alleged taint of the prior proceedings." *Id.*

Fourth, GIA sought to safeguard interests that were "arguably within the zone of interests to be protected or regulated by the statute ... in question." *Lee,* 423 A.2d at 416. D.C.Code § 1–1181.1(b) (1992) specifies that the Procurement Practices Act supports the following purposes among others:

(2) To foster effective and equitably broad-based competition in the District of Columbia ...;

. . . . .

(4) To provide for increased public confidence in the procedures followed in public procurement;

. . . . .

(7) To insure the fair and equitable treatment of all persons who deal with the procurement system of the District government;

. . . . .

(11) To provide safeguards for the maintenance of a procurement system of quality and integrity....

In claiming that the District (1) had failed to follow proper procedures in evaluating its proposals and (2) had awarded the contract to a service provider that did not meet the District's standards for integrity, GIA was seeking to protect interests in fair competition and integrity that lie at the heart of the Procurement Practices Act.

Fifth, no argument can be made that GIA was merely raising a generalized grievance or seeking to vindicate the rights of third parties. While a disappointed bidder's challenge to the government's procurement process also serves the public interest in fair and efficient government, the bidder's grievance is also particularized, insofar as the bidder is seeking a procurement contract.

Finally, we discern "no clear legislative intent to withhold judicial review" from bid protestors. *Lee,* 423 A.2d at 416. Indeed, as we noted above in Part III.A., the District concedes that GIA is entitled to judicial review.

We therefore conclude that GIA had standing to seek relief in the Superior Court. In doing so, we reject the District's claim that GIA has no right to pursue relief in the Superior Court until after the CAB has issued a decision. A disappointed bidder who has shown standing has the right to avail himself or herself of the Superior Court's review jurisdiction, which also includes, for reasons we have already set forth in Part III.A., the jurisdiction to hear claims for interim relief before the CAB has rendered a decision.

We also reject, for similar reasons, the District's claim that D.C.Code § 1–1189.8(e)(1), see *supra* note 12, limits GIA's

right to interim relief in the trial court. We recognize, as the District points out and as the CAB held in an earlier decision issued in this case, see *supra* note 12, that § 1-1189.-8(e)(1) appears to prohibit the CAB from enjoining a contract award. But that fact has no bearing on GIA's standing to seek relief in the Superior Court. It can hardly be said that § 1-1189.8 indicates any intent to withhold judicial review as a whole; it pertains solely to the availability of a particular remedy from the CAB. Nor can it be argued that § 1-1189.8 limits the availability of a preliminary injunction from the Superior Court. As we have already demonstrated in Part III.A., the power to grant interim relief is incidental to the Superior Court's review jurisdiction and cannot be overridden by the Procurement Practices Act. Therefore, where a disappointed bidder such as GIA can demonstrate standing, it can sue for emergency relief in the Superior Court regardless of the CAB's apparent incapacity to issue such relief.

### C. Exhaustion of Remedies

■ Finally, the District argues that the trial court lacked authority to issue a preliminary injunction because GIA had not exhausted its remedies. We disagree.

It is a "well-established doctrine that where a statute provides an administrative forum to resolve disputes, 'no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'" *Dano Resource Recovery, Inc. v. District of Columbia,* 566 A.2d 483, 485 (D.C.1989) (quoting *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969)) (further citation and internal quotation marks omitted); *see also Bender v. District of Columbia Dep't of Employment Servs.,* 562 A.2d 1205, 1207–08 (D.C.1989) and authorities cited therein. As the Supreme Court observed in *McKart,* there are sound policy grounds for adhering to this doctrine:

The reasons for making such procedures exclusive, and for the judicial application of the exhaustion doctrine in cases where the statutory requirement of exclusivity is not so explicit, are not difficult to understand. A primary purpose is, of course, the avoidance of premature interruption of the administrative process. The agency, like a trial court, is created for the purpose of applying a statute in the first instance. Accordingly, it is normally desirable to let the agency develop the necessary factual background upon which decisions should be based. And since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise. And of course it is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages.

*McKart,* 395 U.S. at 193–94, 89 S.Ct. at 1662–63; *see also McCarthy v. Madigan,* —— U.S. ——, ——–——, 112 S.Ct. 1081, 1086–87, 117 L.Ed.2d 291 (1992); *Dano Resource Recovery,* 566 A.2d at 485; *Bender,* 562 A.2d at 1208.

■ Unlike jurisdiction and standing, however, exhaustion of remedies is a "flexible doctrine," *National Treasury Employees Union v. King,* 295 U.S.App.D.C. 153, 156, 961 F.2d 240, 243 (1992), subject to "a number of interrelated exceptions," including "inadequate remedy, unavailable remedy, and futility," *Dano Resource Recovery,* 566 A.2d at 486.

■ Both the inadequacy and unavailability exceptions are relevant in a case such as this where the movant alleges imminent, danger of irreparable harm and seeks emergency relief not available from the administrative forum.[16] " '[A]dministrative remedies need not be pursued if the litigant's interests in immediate judicial review outweigh the

---

16. In this particular case, the trial court held that GIA had in fact exhausted its remedies because the CAB had denied GIA's request for a preliminary injunction on the ground that the CAB lacked the authority to issue preliminary relief. We are not sure that the trial court's

reasoning was technically correct, insofar as the doctrine of exhaustion of remedies usually refers not to the exhaustion of particular remedies, but to the exhaustion of "all possible remedies within the agency itself." 5 JACOB A. STEIN ET AL., ADMINISTRATIVE LAW § 49.01, at 49–3 (1993).

government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further.'" *McCarthy,* —— U.S. at ——, 112 S.Ct. at 1087 (quoting *West v. Bergland,* 611 F.2d 710, 715 (8th Cir.1979), *cert. denied,* 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980)). In particular, the Supreme Court observed in *McCarthy* that the interests of a party in obtaining prompt judicial review may weigh heavily against requiring administrative exhaustion in situations where, even though "the administrative decisionmaking schedule is otherwise reasonable and definite, a particular plaintiff may suffer irreparable harm if unable to secure immediate judicial consideration of his [or her] claim." —— U.S. at ——, 112 S.Ct. at 1087; *see also* 5 JACOB A. STEIN, ET AL., ADMINISTRATIVE LAW, § 49.02[2], at 49–50 (1993). For instance, in *Bowen v. City of N.Y.,* 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986), the Supreme Court held that a federal district court did not err in allowing persons who had not exhausted their administrative remedies to challenge the denial of disability benefits to them. Otherwise, the Court observed, "the claimants in this case would be irreparably injured were the exhaustion requirement now enforced against them." *Id.* at 483, 106 S.Ct. at 2032.

For this reason, we are unwilling to say, as a rule of general application, that a disappointed bidder who alleges irreparable harm as the result of improper agency action must nevertheless always await the CAB's decision before seeking relief in the trial court. Of course, the protestor must still show that he or she is entitled to such extraordinary relief in the individual case. We now turn to that inquiry.

## IV. WAS GIA ENTITLED TO A PRELIMINARY INJUNCTION?

■ Thus far we have considered only the trial court's general authority to issue a preliminary injunction to a disappointed bidder on a District contract pending the com-

pletion of the bidder's protest to the CAB. We now consider the more particular question whether, on the facts of this case, GIA was entitled to such relief.[17]

### A. Standard for Granting Preliminary Injunctive Relief

"The decision to grant or deny preliminary injunctive relief is committed to the sound discretion of the trial court." *Stamenich v. Markovic,* 462 A.2d 452, 456 (D.C.1983). In exercising its discretion, however, the trial court must consider the following criteria:

A preliminary injunction is an extraordinary remedy, and the trial court's power to issue it should be exercised only after careful deliberation has persuaded it of the necessity for the relief. A proper exercise of discretion requires the trial court to consider whether the moving party has clearly demonstrated (1) that there is a substantial likelihood he [or she] will prevail on the merits; (2) that he [or she] is in danger of suffering irreparable harm during the pendency of the action; (3) that more harm will result to him [or her] from the denial of the injunction than will result to the defendant from its grant; and, in appropriate cases, (4) that the public interest will not be disserved by the issuance of the requested order.

*Wieck,* 350 A.2d at 387.

■ The trial court must be especially careful where, as here, the requested relief would enjoin agency action pending the outcome of administrative review. "The circumstances that will justify . . . interference with nonfinal agency action must be truly extraordinary. . . ." *Public Util. Comm'r of Or. v. Bonneville Power Admin.,* 767 F.2d 622, 630 (9th Cir.1985). In such a case the trial court must bear in mind that it is acting in a field that is normally confided to the agency's expertise and must "give serious weight to the obviously disruptive effect which the grant of the temporary relief . . . [is] likely to have on the administrative process." *Samp-*

---

17. As we stated earlier, *supra* note 3, we treat the trial court's order as a preliminary injunction because it was temporary and did not purport to determine the merits of GIA's bid protest. Both GIA and the District appear to share this view of the trial court's order, insofar as they apply the standard test for granting a preliminary injunction in arguing for and against the trial court's order in their briefs on appeal.

*son v. Murray*, 415 U.S. 61, 83, 94 S.Ct. 937, 949, 39 L.Ed.2d 166 (1974). Moreover, as the United States Court of Appeals for the District of Columbia Circuit has observed,

> In the field of government procurement the courts must be sedulous to heed the admonition that their authority to vacate and enjoin action that is illegal must be exercised with restraint les[t] the courts fall into the error of supposing that they may revise "action simply because [they] happen to think it ill-considered, or to represent the less appealing alternative solution available."

*M. Steinthal & Co. v. Seamans*, 147 U.S.App. D.C. 221, 230–31, 455 F.2d 1289, 1298–99 (1971) (quoting *Calcutta E. Coast of India & E. Pakistan/U.S.A. Conference v. Federal Maritime Comm'n*, 130 U.S.App.D.C. 261, 264, 399 F.2d 994, 997 (1968)); *see Sea–Land Serv., Inc. v. Brown*, 600 F.2d 429, 434–35 (3d Cir.1979).

### B. Review of the Trial Court's Analysis

■ In reviewing the trial court's exercise of discretion, "our role ... is not to resolve the merits of the underlying dispute between the litigants," except insofar as "the action of the trial court turns on a question of law or statutory interpretation." *Don't Tear It Down, Inc. v. District of Columbia*, 395 A.2d 388, 390, 391 (D.C.1978). In undertaking our review, we must

> (1) examine the trial court's findings and conclusions to see if they are sufficiently supported by the record; (2) assure that the trial court's analysis reflects a resolution of all the issues which necessarily underlie the issuance of an injunction; and (3) inquire into any other claims of an abuse of discretion by the trial court.

*Id.* at 390–91 (quoting *Wieck*, 350 A.2d at 387) (brackets omitted). In this case, we conclude that the trial court's analysis was flawed in several respects.

### 1. Irreparable Harm

■ Most strikingly, the trial court failed to make any finding that GIA would suffer irreparable harm absent an injunction. This is a serious omission.[18] In determining whether to grant a motion for a preliminary injunction, "the most important inquiry is that concerning irreparable injury ... because the primary justification for the issuance of a preliminary injunction 'is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'" *Wieck*, 350 A.2d at 387–88 (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 576 (5th Cir.1974)). The necessity for specific and extensive findings on this point becomes all the greater where, as here, the trial court is being asked to interfere with government action pending agency review.

■ In the course of discussing the comparative harm to GIA and to QDP, the trial judge did mention that GIA faced a loss of 50 percent of its revenue and might be forced to lay off as many as four employees. But the trial court did not determine whether such a loss would be "irreparable." Nor can we say on this record, as a matter of law, that GIA necessarily faced irreparable harm.

First, it is not clear that the potential loss in revenue faced by GIA would translate into an equally serious loss in profits. *See Big Country Foods v. Board of Educ. of Anchorage Sch. Dist.*, 868 F.2d 1085, 1088 (9th Cir. 1989) (loss of income, without any demonstra-

---

**18.** GIA contends that "proof of a violation of law supplants the need to demonstrate irreparable injury." It is true that courts find irreparable harm and grant injunctive relief to a disappointed bidder more readily where the government has violated statutory or regulatory requirements. *See, e.g., O'Donnell, supra* note 1, 295 U.S.App.D.C. at 325–26, 963 F.2d at 428–29 (contractor excluded from consideration because of minority preferences that were probably unconstitutional entitled to preliminary injunction requiring District of Columbia to consider contractor's future bids while underlying suit was pending); *Abel Converting, Inc. v. United States*, 679 F.Supp. 1133, 1142 (D.D.C.1988) (failure to mail solicitation to incumbent contractor violated federal regulations, entitling contractor to preliminary injunction forbidding award of contract). In this case, however, there was no clear proof of a statutory or regulatory violation. While the trial court stated that QDP's failure to disclose Parnham's convictions cast doubt on QDP's standing as a responsible contractor, the court never held that the District had actually violated the law. As such, the trial court's analysis did not obviate the need for a finding of irreparable harm to GIA.

tion of lost profits, insufficient to show irreparable harm).

Second, assuming that the loss of the benefits administration contract would reduce GIA's profits, that alone would not have been sufficient to show irreparable harm. "[E]conomic loss does not, in and of itself, constitute irreparable harm," unless the "loss threatens the very existence of the movant's business." *Wisconsin Gas Co. v. FERC*, 244 U.S.App.D.C. 349, 354, 758 F.2d 669, 674 (1985); *see also Sampson*, 415 U.S. at 91–92, 94 S.Ct. at 953–54 (loss of income and damaged reputation fall far short of showing of irreparable injury required to justify temporary injunction reinstating employee). Thus, courts have denied injunctive relief to bid protestors who cannot show any potential injury more serious than mere pecuniary loss. *See Cunningham v. Adams*, 808 F.2d 815, 822 (11th Cir.1987) (lost profits and loss of airport concession insufficient to show irreparable harm); *Vikonics, Inc. v. United States*, 749 F.Supp. 315, 319 (D.D.C.1990) (drop in stock value, alleged difficulty in raising capital, and potential drop in bond rating insufficient to show irreparable harm); *M.C. Thomas Const. Co. v. St. Louis*, 679 F.Supp. 908, 909 (E.D.Mo.1988) (fact that contract would improve company's financial position insufficient to show irreparable harm). In this case, while the trial judge stated that GIA might be forced to lay off employees, he never suggested that GIA's existence was endangered.[19]

Third, while the trial judge stated generally that GIA had no adequate legal or administrative remedies, he did not specifically consider whether the remedies that the CAB could have ordered might have provided adequate compensation for GIA's harms. For example, counsel for the District suggested that, although the CAB could not award interim relief, once it had made its findings the CAB could require the District to restart the entire contract, including the base year.

### 2. Balancing the Harms to the Parties

As we noted above, before awarding injunctive relief the trial court must determine that *more* harm will result to the movant from the denial of the injunction than will result to the nonmoving parties from its grant. That was not the case here, however. Comparing the possible effects of an injunction on QDP with the harm that GIA might suffer in the absence of an injunction, the trial court found only that "neither party will be harmed appreciably more than the other by the court's decision." Furthermore, the trial court should have added into this calculus not only the extra time and effort that would be expended by the District in rebidding the contract, but also the substantial confusion and claim-processing delays that the District's employees would suffer as a result of this process. *See Amalgamated Transit Union v. Donovan*, 554 F.Supp. 589, 599 (D.D.C.1982) (court must consider harm not only to party opposing injunctive relief but also to those parties not before court who may be interested in proceedings). The trial court acknowledged these problems in considering the "public interest" test but failed to consider them in balancing the equities between the parties. When one adds these factors to what was, in the trial court's view, a fairly even situation, it becomes apparent that in reality the harm the injunction was likely to impose upon QDP, the District, and the District's employees in processing their claims significantly outweighed the potential harm faced by GIA in the absence of an injunction.

### 3. Likelihood of Success

The trial court concluded that there was a substantial likelihood that GIA would succeed in its protest before the CAB. In the end, however, the CAB rejected GIA's bid protest. Of course, we will not judge the trial court's determination by hindsight. Nor do we assume that the CAB's decision was necessarily correct, since GIA's appeal of that decision is still pending. We note the contrasting results, however, because they

---

19. With regard to QDP, the trial court specifically found that an injunction ordering rebidding of the contract would not threaten QDP's existence. Insofar as the trial court further found that the

financial harm faced by QDP if an injunction issued was roughly comparable to that faced by GIA without an injunction, this would suggest that GIA's demise was not imminent either.

highlight the difficulty that a court faces in predicting a party's likelihood of success on the merits in an administrative forum, where the issues are often technical and the standards for judgment specialized.

In this case, for instance, it is apparent that the trial court gave little weight to the contracting officer's determination, after reviewing Parnham's convictions, that QDP was still a responsible contractor. By contrast, the CAB, applying its own established precedents, gave that determination considerable deference:

> This Board will not reverse an affirmative determination of responsibility, which is largely a business judgment, unless the protestor shows possible fraud or bad faith on the part of procurement officials, or that the solicitation contains definitive responsibility criteria which have not been met.

40 D.C.Reg. at 4518.

■ Where a trial court is attempting to predict the outcome of an administrative review, it is incumbent upon the court to familiarize itself with the applicable criteria used by the review board. The parties also have a responsibility to aid the court in this task. While we do not suggest that the court is absolutely obliged to adhere to those criteria if it truly believes them to be wrong, it should generally defer to an administrative review board's expertise in developing agency review procedures and standards, leaving challenges to those procedures and standards to be dealt with on direct appeal.

### 4. The Public Interest

The trial court concluded that the public interest overwhelmingly favored issuing an injunction, in order to send "a message to all companies that seek to contract with the District of Columbia that they can not profit from their misrepresentations—that any contract won through those methods is as fragile

and ephemeral as the cherry blossoms of April."

■ We appreciate the trial court's efforts to do justice and its strong concern that QDP may have profited from deceit. But the court must also bear in mind that a preliminary injunction is an extraordinary remedy, especially where, as here, it interferes in a case that is already before another tribunal. In such circumstances the trial court must exercise restraint and should generally refrain from granting emergency relief unless the potential harm to the movant is great and the likelihood of success on the merits particularly strong. As we noted above, the primary goal of a preliminary injunction is to prevent irreparable harm to the movant. A preliminary injunction is ill-suited to serve punitive ends.

Accordingly, we conclude that the trial court abused its discretion in issuing the injunction in this case.

### V. CONCLUSION

■ Because the injunction in this case was erroneously issued, the civil contempt order requiring the District to pay fines to GIA cannot stand.[20] See supra note 5 and accompanying text. Accordingly, we reverse and remand this case for vacation of the contempt order.

*So ordered.*

---

20. We also note that, even if the underlying injunction were valid, we still could not sustain the fines assessed by the court, because the trial court failed to explain the basis for the amount awarded to GIA. While a civil contempt fine may be both coercive and compensatory, compensation of the complainant must be related to

actual losses. *See New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1353–54 (2d Cir.1989); *NLRB v. Laborers' Internat'l Union,* 882 F.2d 949, 955 (5th Cir.1989); *In re Chase & Sanborn Corp.,* 872 F.2d 397, 400–01 (11th Cir. 1989).