**RDP DEVELOPMENT CORPORATION,**
Appellant,

v.

**DISTRICT OF COLUMBIA,**
et al., Appellees.

Nos. 92–CV–1080, 92–CV–1235.

District of Columbia Court of Appeals.

Argued June 17, 1994.

Decided Aug. 4, 1994.

Richard B. Nettler, with whom Geoffrey P. Gitner, Washington, DC, was on the brief, for appellant.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom John Payton, Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, were on the brief, for appellees.

Before TERRY, SCHWELB and KING, Associate Judges.

KING, Associate Judge:

Appellant RDP Development Corporation ("RDP") appeals from an order of the Superior Court granting summary judgment in favor of appellee the District of Columbia ("the District") and dismissing the remainder

of RDP's action. In granting the District's motion for summary judgment, the trial court ruled that a lease/purchase agreement entered into by RDP and the District was subject to an emergency law requiring compliance with competitive bidding requirements set forth in the District's procurement laws. The trial court further ruled that the question whether there had been substantial compliance with those requirements should be decided by the Contract Appeals Board, and it *sua sponte* dismissed the remainder of the action, without prejudice, for lack of jurisdiction. Finding no reversible error, we affirm.

## I.

For purposes of this consolidated appeal,[1] the following is undisputed. The lease/purchase agreement at issue involves commercial real estate located at 642 H Street, N.E., in the District of Columbia. On July 19, 1990, RDP submitted a formal lease proposal to the District, offering to purchase and renovate the property and then lease or sell it to the District. On October 4, 1990, RDP sent District officials a commitment letter containing the terms of the proposed contract.

Five days later, emergency legislation (D.C.Act 8–264)[2] was introduced in the Council of the District of Columbia ("the Council"), proposing to make the "District of Columbia Procurement Practices Act of 1985"[3] ("PPA") applicable to the "District of Columbia Revenue Act of 1970."[4] The emergency legislation was designed to preclude the Mayor from awarding any contract that provided for the acquisition of a leasehold interest unless the competitive procurement requirements of the PPA were followed. *See* D.C.Code § 1–336(h).[5] It also required the approval by the Council prior to the appropriation or expending of any funds to construct, purchase, or acquire any building or interest in any building that involved a total expenditure in excess of $1,000,000. *See* D.C.Code §§ 1–336(c) and 1–1181.5a; *see also infra* note 16.[6] Although the Council passed the emergency legislation, the Mayor vetoed it on October 25, 1990.

On November 6, 1990, the Office of the Corporation Counsel and the Director of the Department of Administrative Services ("the

1. RDP filed two separate notices of appeal from the trial court's August 3, 1992, order. According to the docket, one notice of appeal addressed the part of the order denying RDP's motion for summary judgment, while the second addressed the granting, in part, of the District's motion to dismiss or, in the alternative, for summary judgment. Upon RDP's motion in this court, we consolidated the appeals.

2. The "Acquisition of Space Needs For District Government Officers and Employees Emergency Act of 1990," D.C.Act 8–264, § 2, 37 D.C.Reg. 7336 (1990).

3. D.C.Law 6–85, §§ 101–1006a, 32 D.C.Reg. 7396 (1985) (codified as amended in D.C.Code §§ 1–1181.1 to –1192.6 (1992 & 1993 Supp.)).

4. Pub.L. No. 91–650, title VII, § 705(a), (b), 84 Stat.1939 (1971) (codified as amended in D.C.Code § 1–336 (1992)).

5. Section 1–336(h) provides:

The Mayor shall not acquire a leasehold interest in any building that is proposed to be leased for the predominant use by, or constructed for lease to and for predominant use by, the District

government unless the procurement of the leasehold interest is done pursuant to [D.C.Code] §§ 1–1183.3 and 1–1183.4.

D.C.Code §§ 1–1183.3 and –1183.4, respectively, address procedures for competitive sealed bids and proposals. The PPA requires that all contracts for the purchase of goods and services worth more than $10,000 must be awarded on the basis of competitive sealed bidding. *See* D.C.Code §§ 1–1183.3, –1183.6. The bidding requirement can be dispensed with in the event specifications cannot be prepared that permit a lowest bid award, there is only one source of the goods or services to be acquired, there is insufficient time for bidding, or for any other "compelling" reason. *See* D.C.Code § 1–1183.3(a). A contract can be awarded by means of competitive sealed proposals when bidding "is not practical." *See* D.C.Code § 1–1183.4(a).

6. D.C.Code § 1–336(c) provides, in part:

No funds under the control of the Mayor shall be obligated or expended to construct, alter, purchase, or acquire any building or interest in any building to be used as a public building for the District government or to house a program funded through the District government that involves a total expenditure in excess of $1,000,000 unless the proposed construction, alteration, purchase,

Director") approved the terms of the lease/purchase agreement, and the Director submitted the contract to the City Administrator, Carol B. Thompson, for her approval. On November 9, 1990, Thompson dated and initialed a "Mayor's Decision/Information Form" as approved "thru" the City Administrator.[7] On November 13, 1990, the Council overrode the Mayor's veto, and D.C.Act 8–264 went into effect. D.C.Act 8–264 also contained a retroactivity provision, making it applicable to any "proposed contract or other agreement for real property, goods, or services for use by the District of Columbia that ha[d] not been completed prior to October 1, 1990."

Three days after D.C.Act 8–264 became law, the Mayor approved the lease/purchase agreement.[8] Although a resolution was introduced to the Council seeking approval of the lease/purchase agreement, the Council never approved the contract. On December 31, 1990, some forty-seven days after D.C.Act 8–264 was passed by the Council over the Mayor's veto, the Mayor signed the lease/purchase agreement,[9] reflecting his understanding that the emergency law had expired the day before the date of signing.[10] On January 2, 1991, the last day of his term, the Mayor signed permanent legislation (D.C.Law 8–257)[11] that is in all material respects identical to D.C.Act 8–264. Like its predecessor, the permanent act, by its terms, was retroactive to October 1, 1990.

On May 23, 1991, RDP requested from the District an estoppel certificate, which was required under the lease/purchase agreement, in order to obtain financing to complete the purchase and development of the 642 H Street property.[12] On September 5, 1991, after several unsuccessful attempts to secure an estoppel certificate, RDP filed an action in the Superior Court seeking temporary and permanent injunctive relief, specific performance, and damages regarding the lease/purchase agreement. The District moved to dismiss the action or, in the alternative, sought summary judgment, contending both that the former administration had not complied with the applicable competitive bidding requirements and that the contract had never been approved by the Council. RDP opposed that motion and filed a cross-motion for summary judgment, maintaining, *inter alia*, that the emergency law could not have invalidated the Mayor's signing of the lease/purchase agreement since the emergency law had expired on the previous day. RDP further argued that the trial court had

or acquisition has been submitted to and approved by the Council, by resolution....

7. The form expressly provided that "Mayoral approval is required for all leases over $1,000,-000.00 before Contracting Officer can acknowledge on behalf of the District." *See also* Mayor's Order No. 88–273, § 204, 36 D.C.Reg. 415, 422 (1989) ("A contracting officer shall obtain written approval by the Mayor prior to executing any contract or contract modification, including those related to real property, for one million dollars ($1,000,000) or over.").

8. Annual rent for the building was $2,343,536.

9. It is undisputed that at no point prior to the time the Mayor signed the contract had the competitive bidding requirements been actually satisfied. The trial court, however, did not reach the issue, *see infra* text at pp. 12–13, of whether the bidding requirements had been substantially satisfied.

10. Assuming the ninety-day period ran from October 1, 1990, rather than from the date of enactment, D.C.Act 8–264 would have expired on December 30, 1990.

11. D.C.Law 8–257, § 2, 38 D.C.Reg. 1874 (1991) (codified in D.C.Code § 1–336) (effective March 8, 1991). Because D.C.Act 8–264 was to expire before Congress approved the permanent legislation, on February 28, 1991, the Council passed a second emergency act. *See* the "Acquisition of Space Needs For District Government Officers and Employees Emergency Act of 1990 Congressional Adjournment Emergency Act of 1991," D.C.Act 9–5, § 2, 38 D.C.Reg. 1464 (1991) (effective February 28, 1991). The second emergency legislation was similar to the first emergency legislation, contained a provision making it applicable to contracts that had not been completed prior to October 1, 1990, and was effective immediately upon enactment.

12. Under the terms of the lease, the District was required to provide RDP, within seven days of any request, with a certificate stating: (1) whether the lease had been unmodified and was in effect; (2) whether there were existing defenses against enforcement of the lease; (3) the dates upon which the District had paid rent; (4) that the District has no knowledge of uncured defaults; (5) that the District had no knowledge of anything that might result in the termination of the lease; (6) the District's address; and (7) any

authority to enforce the contract if there had been good faith and substantial compliance with the procurement provisions. Thereafter, the District filed an opposition to RDP's cross-motion for summary judgment, and RDP filed a reply.

The trial court granted summary judgment in favor of the District, concluding that the Mayor could not have delegated his authority to enter into the lease/purchase agreement with RDP and that, therefore, the statutorily required approval by the Mayor of the contract did not occur until the Mayor had signed it on November 16, 1990, at which time D.C.Act 8–264 was in effect. Specifically, the court held:

> Despite plaintiff's argument that those officials required to approve the lease had not done so prior to October 1, 1990, it is undisputed that the statutorily mandated approval by the Mayor was not obtained until November 16, 1990—three days after the Emergency Act became effective.

> On November 16, 1990, the Mayor was no longer legally authorized to enter into this lease, however, because the Emergency Act required the lease to be obtained pursuant to the competitive procurement process.

(Citing D.C.Code § 1–336(h)). It thus ruled that "the lease was subject to the competitive procurement process mandated by the Emergency Act which became effective November 13, 1990[,] and the Permanent Act which became retroactively effective October 1, 1990." [13]

The trial court further held, citing D.C.Code §§ 1–1182.5(d)(1) and –1188.5, that it was without authority to determine whether there had been substantial compliance with the Procurement Practices Act and that RDP must first seek that determination from the Contract Appeals Board ("the Board"). This consolidated appeal followed.[14]

## II.

Summary judgment shall be entered if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super.Ct.Civ.R. 56(c). In reviewing the grant of summary judgment, we apply the same standards and review the record *de novo*. *Holland v. Hannan*, 456 A.2d 807, 814 (D.C.1983) (citations omitted). We must decide, therefore, whether the District was entitled to judgment as a matter of law based upon the undisputed facts set forth above.

RDP contends the trial court erred in concluding that the competitive bidding requirements were applicable to the lease/purchase agreement because D.C.Act 8–264, the emergency law, had expired prior to the time the Mayor executed the contract. Alternatively, RDP argues that the competitive bidding requirements were inapplicable because the contract was approved before the Council enacted the emergency legislation over the Mayor's veto on November 13, 1990, and D.C.Law 8–257, the permanent act, cannot be applied retroactively.

■ In support of its first contention, RDP maintains D.C.Act 8–264 could not have been effective for more than ninety days after October 1, 1990, *i.e.*, that it expired on December 30, 1990. Title IV, Section 412(a) of the District of Columbia Self–Government and Governmental Reorganizations Act ("the Charter") [15] provides, however, that "[i]f the Council determines ... that emergency circumstances make it necessary that an act be passed after a single reading, or that it take effect immediately upon enactment, such act shall be effective for a period of not to exceed 90 days." D.C.Code § 1–229(a). *See also* D.C.Code § 1–233(c)(1) (1992) (emergency legislation takes effect immediately upon enactment without congressional review). We

other information that might be reasonably requested.

13. The trial court noted that RDP did not contend that the "lease was obtained in conformity with the competitive procurement requirements set forth at [D.C.Code] §§ 1–1183.3 and 1–1183.4."

14. Subsequent to the entry of the trial court's order, RDP filed a claim with the Board. During oral argument, the parties informed the court that the action before the Board is still pending.

15. Pub.L. No. 93–198, title IV, § 412, 87 Stat. 788 (1973) (codified as amended at D.C.Code § 1–229(a) (1992)).

hold that the language of D.C.Code § 1–229(a) contemplates that the life of an emergency act is to be measured prospectively from the date of enactment. *See District of Columbia v. Washington Home Ownership Council, Inc.*, 415 A.2d 1349, 1352 (D.C.1980) (en banc) (emergency act is effective for a period not to exceed ninety days) (citation omitted). Viewed in that way, the ninety-day period began to run on November 13, 1990, when the Council passed D.C.Act 8–264, and the act was effective until February 11, 1991. Thus, D.C.Act 8–264 was in force when the Mayor approved the lease/purchase agreement on November 16, 1990, and when he signed the actual contract on December 31, 1990.

■ In support of its second contention, RDP argues that the contract was "awarded" by the City Administrator, as an authorized agent of the Mayor, when Thompson approved the contract on November 9, 1990, *i.e.*, before D.C.Law 8–257 became effective. RDP thus reasons that the Mayor's approval of the contract was not necessary. In our view, however, an indication by the City Administrator on the Mayor's Decision/Information Form that the contract has passed "thru" her could not serve as a substitute for approval by the Mayor when the line for the Mayor's signature remained blank. If the Mayor's personal approval were not required, there would be no need for a place for the Mayor's signature.

The Mayor's authority to enter into leases is set out in D.C.Code § 1–336.[16] D.C.Code § 1–339(a) (1992) authorizes the Mayor to appoint District employees as contracting officers with powers to enter into lease agreements on behalf of the District; it provides, however, that:

> no contract of $3,000 or more entered into on behalf of the said District of Columbia by any contracting officer ... shall be binding upon said District of Columbia, or give rise to any claim or demand against said District of Columbia, until approved by the Mayor of the District of Columbia.

As the contract at issue here was for an amount in excess of $3,000, there was no binding contract until, at the earliest, the Mayor approved the lease/purchase agreement, which occurred three days after D.C.Act 8–264 was enacted.[17] *See District of Columbia v. McGregor Props.*, 479 A.2d 1270, 1273 (D.C.1984) (citation omitted). The lease/purchase agreement, therefore, was subject to the competitive bidding requirements prior to the time the Mayor had given his approval.

We need not decide the whether the emergency or permanent laws can be applied retroactively to October 1, 1990, since we hold that if the lease/purchase agreement is deemed to have been executed either as of the time the Mayor approved it on November 16, 1990, or actually signed it on December 31, 1990, the competitive bidding requirements of D.C.Act 8–264 applied. In short, D.C.Act 8–264 was applicable to the lease/purchase agreement, rendering the contract subject to competitive bidding requirements and, thus, the trial court did not err in ruling that the District was entitled to summary judgment as a matter of law.[18]

**16.** D.C.Code § 1–336(a) provides:
The Mayor of the District of Columbia is authorized to enter into lease agreements with any person, copartnership, corporation, or other entity, which do not bind the government of the District of Columbia for periods in excess of 20 years for each such lease agreement, on such terms and conditions, including, without limitation, lease-purchase, as he deems to be in the interest of the District of Columbia and necessary for the accommodation of District of Columbia agencies and activities in buildings or other improvements which are in existence or are to be constructed by the lessor for such purposes, or on unimproved real property.

**17.** Furthermore, the "Mayor's Decision/Information Form," which was initialed by Thompson, expressly provided that "Mayoral approval is required for all leases over $1,000,000.00 before Contracting Officer can acknowledge on behalf of the District." *See supra* text at p. 3 and note 6.

**18.** RDP contends, citing *Wilson v. Kelly*, 615 A.2d 229 (D.C.1992), where we held that D.C.Code § 1–1181.5a of the PPA exceeded the Council's resolution authority, that D.C.Act 8–264 and D.C.Law 8–257 do not apply because the competitive bidding provisions contained in those laws are not severable from the impermissible council review provisions which are also contained therein. It is a well-established rule of statutory construction, however, "to save and not to destroy" legislation, since "invalid provisions

### III.

RDP contends further that the lease/purchase agreement is valid as "the District of Columbia treated the matter as a sole source procurement before and after any competitive bidding requirements purportedly applied, and, therefore, had substantially if not fully complied with any applicable procurement requirements." The trial court held, however, that "[a]lthough it is undisputed that the Mayor failed to solicit bids pursuant to D.C.Code §§ 1–1183.3 and 1–1183.4, this court lacks jurisdiction to make a final determination as to the validity of the lease." The trial court, ruling that RDP must "exhaust" its administrative remedies with respect to the validity of the lease/purchase agreement under the PPA, dismissed the remainder of RDP's claim without prejudice. Although it appears that the trial court mischaracterized this requirement as one of exhaustion, we conclude that the trial court did not err in dismissing the remainder of RDP's claim.

In *Drayton v. Poretsky Management, Inc.*, 462 A.2d 1115, 1118 (D.C.1983), we observed that the doctrine of exhaustion of administrative remedies should not be confused with the related doctrine of primary jurisdiction. We stated:

> The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

(Citation omitted.) It is undisputed that RDP's claims for temporary and permanent injunctive relief, specific performance, and damages was "originally cognizable in the courts." [19] *See id.*

In ruling that it was without jurisdiction to consider whether the lease/purchase agreement was valid, the trial court properly cited D.C.Code § 1–1182.5(d)(1), which provides that "a contract which is entered into in violation of this chapter or the rules and regulations issued pursuant to this chapter is void, *unless it is determined in a proceeding pursuant to this chapter* or subsequent judicial review that good faith has been shown by

---

are to be severed unless it is evident that without those provisions, the legislature would not have enacted the remaining provisions." *Gary v. United States*, 499 A.2d 815, 821 (D.C.1985) (en banc) (internal quotations and citations omitted).

Nothing in the PPA reflects a determination by the Council that the review provisions are not severable from the remainder of the statute. Moreover, D.C.Code § 49–601 (1990) permits severability of valid portions of District legisla-tion from invalid ones unless the Council has expressly included a non-severability clause in the suspect legislation. It provides:

> Except as provided in subsection (b) of this section, if any provision of any act of the Council of the District of Columbia or the application thereof to any person or circumstance is held to be unconstitutional or beyond the statutory authority of the Council of the District of Columbia, or otherwise invalid, the declaration of invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or

application, *and to this end the provisions of each act of the Council of the District of Columbia are deemed severable.*

D.C.Code § 49–601(a) (emphasis added). Section 49–601(b) also provides that the Council has authority to include a nonseverability clause. No such clause is contained in the PPA. We conclude, therefore, that the provisions are in fact severable.

19. It is well settled that the Superior Court is "a court of general jurisdiction with the power to adjudicate any civil action at law or in equity involving local law." *Andrade v. Jackson*, 401 A.2d 990, 992 (D.C.1979). *See also* D.C.Code § 11–921(a) (1989) ("the Superior Court has jurisdiction of any civil action or other matter (at law or in equity) brought in the District of Columbia"). Moreover, nothing in the lease itself precluded RDP from bringing its action for temporary and permanent injunctive relief, specific performance, and damages in the Superior Court. Thus, RDP's complaint was properly filed in the Superior Court.

all parties, *and there has been substantial compliance with the provisions of the chapter and the rules and regulations.*"[20] (Emphasis added.) This provision reflects a determination by the Council that a party bringing an action involving a contract with the District must first defer to the expertise of the Director of the Department of Administrative Services (and then to the Board)[21] for a determination of the validity of a contract *vis a vis* the procurement provisions. Thus, the claims involved in RDP's action against the District, though originally cognizable in the Superior Court, also involve issues which "require[ ] resolution of an issue within the special competence of an administrative agency." *Drayton, supra,* 462 A.2d at 1118 (citation omitted). The trial court, therefore, properly retained jurisdiction to determine whether the competitive bidding provisions applies, while it correctly dismissed that portion of RDP's action which addressed the validity of the lease/purchase agreement.[22] We thus conclude that the trial court properly dismissed the remainder of RDP's action without prejudice in order to permit RDP to pursue its remedies under the PPA.[23]

*Affirmed.*

---

20. Further, D.C.Code § 1–336(h) provides that "[t]he Mayor shall not acquire a leasehold interest in any building that is proposed to be leased for the predominant use by, or constructed for lease to and for predominant use by, the District government *unless the procurement of the leasehold interest is done pursuant to [D.C.Code] §§ 1–1183.3 and 1–1183.4.*" (Emphasis added.) The PPA specifically provides, moreover, that "[a]ll claims by a contractor against the District government arising under or relating to a contract shall be in writing and *shall be submitted to the Director* for an informal hearing and decision." D.C.Code § 1–1188.5(a) (emphasis added).

21. *See* D.C.Code § 1–1189.3; *see also* D.C.Code § 1–1189.2(b) ("The chairperson and 2 members of the Board shall be attorneys licensed to practice law in the District who shall have experience in public contract law. All members of the Board shall have experience in the areas of procurement and contract law.").

22. *See Rohr Indus. v. Washington Metro. Area Transit Auth.,* 232 U.S.App.D.C. 92, 96, 720 F.2d 1319, 1323 (1983) (claim that was beyond the scope of contract disputes clause, which would have rendered it subject to administrative resolution, could not properly be dismissed on exhaustion grounds and, since there was no administrative remedy, doctrine of primary jurisdiction did not apply) (citation omitted).

23. RDP contends our decision in *District of Columbia v. Group Ins. Admin.,* 633 A.2d 2 (D.C. 1993), requires a different result. In *Group Insurance,* the District, arguing that the trial court lacked authority to issue a preliminary injunction (which in effect required the District to re-bid a contract for the administration of health care plans), maintained that Group Insurance had failed to exhaust its administrative remedies under the PPA before the Board.

RDP's reliance on *Group Insurance* is misplaced for at least two reasons. First, nothing in that case addresses the issue of primary jurisdiction. Second, in *Group Insurance* we held that the trial court had authority to order *emergency* relief where "a disappointed bidder ... alleges irreparable harm as the result of improper agency action." *Id.* at 21. We reasoned that "administrative remedies need not be pursued if the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." *Id.* at 20–21 (internal quotation, alteration, and citation omitted). Thus, nothing in *Group Insurance* dispenses with the requirement that a litigant seek redress of a grievance before the appropriate administrative agency before pursuing judicial relief. Thus, *Group Insurance* is inapposite to the instant case.