[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff Bell Atlantic NYNEX Mobile (Bell Atlantic) appeals from a decision of the defendant Department of Public Utility Control (DPUC) on an application of Southern Connecticut Telephone Company (SNET). The plaintiff Bell Atlantic is the general partner of a non-wireline cellular mobile telecommunications provider, Cellco Partnership, and is licensed by the Federal Communications Commission (FCC) as a provider of wireless commercial mobile radio service (CMRS).[1] The defendant DPUC is a state agency regulating and supervising public service companies providing service to customers in Connecticut pursuant to Title 16 of the Connecticut general statutes. The application of SNET sought approval to offer local network interconnection arrangements and related services to other telecommunication carriers. The DPUC decision on the application requires Bell Atlantic and other CMRS providers to contribute to SNET's costs of implementing an interim plan to allow customers to retain an existing telephone number when changing local service telecommunication providers. For the reasons set forth below, the appeal is dismissed.
As stated so succinctly by the court in Bell Atlantic NYNEXMobile, Inc. v. Connecticut Department of Public Utility Control, Superior Court, judicial district of Hartford/New Britain at Hartford, No. 555232, p. 3 (August 14, 1997), "[t]he telecommunications revolution has resulted in a transformation in the telephone service industry from a monopolistic, highly regulated form to a less regulated competitive model." By Public Act 94-83, the Connecticut legislature established a policy plan for the progress of telecommunications in Connecticut and set forth its goals in General Statutes § 16-247a(a). That statute reads: CT Page 3419
 Goals of the state. Definitions. (a) Due to the following: Affordable, high quality telecommunications services that meet the needs of individuals and businesses in the state are necessary and vital to the welfare and development of our society; the efficient provision of modern telecommunications services by multiple providers will promote economic development in the state; expanded employment opportunities for residents of the state in the provision of telecommunications services benefit the society and economy of the state; and advanced telecommunications services enhance the delivery of services by public and not-for-profit institutions, it is, therefore, the goal of the state to (1) ensure the universal availability and accessibility of high quality, affordable telecommunications services to all residents and businesses in the state, (2) promote the development of effective competition as a means of providing customers with the widest possible choice of services, (3) utilize forms of regulation commensurate with the level of competition in the relevant telecommunications service market, (4) facilitate the efficient development and deployment of an advanced telecommunications infrastructure, including open networks with maximum interoperability and interconnectivity, (5) encourage shared use of existing facilities and cooperative development of new facilities where legally possible, and technically and economically feasible, and (6) ensure that providers of telecommunications services in the state provide high quality customer service and high quality technical service. The department shall implement the provisions of this section, sections 16-1, 16-18a, 16-19, 16-19e, 16-22, 16-247b, 16-247c, 16-247e to 16-247i, inclusive, and 16-247k and subsection (e) of section 16-331 in accordance with these goals.
Part of the expressed goal of achieving competition in telecommunications is met through the implementation of General Statutes § 16-247b which requires the department to initiate proceedings to "unbundle the noncompetitive and emerging competitive functions of a telecommunications company's local telecommunications network that are used to provide telecommunications services and which the department determines, after notice and hearing, are reasonably capable of being tariffed and offered as separate services."
In November 1995, SNET, a local exchange carrier (LEC) and public service company subject to DPUC regulation, applied for CT Page 3420 DPUC approval to offer network interconnection arrangements and co-carrier unbundling and wholesale tariffs to certified local exchange carrier (CLEC) facilities as non-competitive services. The pertinent part of that application is the offering of service provider local number portability (number portability), which allows an end-user to retain her telephone number when she changes her local service provider. On July 17, 1996, the DPUC issued its decision on the SNET application and found that it could require all telecommunication carriers, including CMRS providers, to share the costs incurred in providing "currently available number portability arrangements." (ROR, Item XII-1, p. 72.) No CMRS provider had participated in the proceeding to this time. (ROR, Item XlI-3, p. 3, note 2.) The July 17, 1996 decision referred to the FCC First Report and Order and Further Notice of Proposed Rulemaking, FCC Doc. No. 95-116 which promulgated standards for implementing the following mandate in the federal 1996 Telecommunications Act:
 (b) Obligations of all local exchange carriers. . . . Each local exchange carrier has the following duties:
(2) Number portability:
 The duty to provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission.
47 U.S.C. § 251(b)(2).
The federal act, which promotes competition and reduces regulation in the national telecommunications market, imposes obligations on local exchange carriers to open their networks to competitors. One of those obligations is the implementation of a number portability system. As noted in the FCC Report, Congress recognized that "the ability to change service providers is only meaningful if a customer can retain his or her local telephone number." FCC Report, ¶ 2, pp. 3-4. The FCC found that CMRS providers are telecommunications carriers under the Act so that local exchange carriers are obligated to provide number portability to customers seeking to switch to CMRS providers. The FCC also found "that number portability provides consumers flexibility in the way they use their telecommunications services and promotes the development of competition among alterative providers of telephone and other telecommunications services." FCC Report, ¶ 30. CT Page 3421
The Act also addresses the costs of establishing number portability. In § 251(e)(2), the Act provides
 The cost of establishing telecommunications numbering administration arrangements and number portability shall be borne by all telecommunications carriers on a competitively neutral basis as determined by the Commission.
Referring to this provision, the FCC determined that it should adopt guidelines for the states in adopting cost recovery mechanisms for "currently available cost recovery methods." FCC Order, ¶ 127, p. 66. Paragraph 130 of that order sets forth to whom the states can allocate the costs.
 Section 251(e)(2) of the Communications Act requires that the costs of providing number portability be borne by "all telecommunications carriers." No party commented on the meaning of the term "all telecommunication carriers." Read literally, the statutory language "all telecommunications carriers" would appear to include any provider of telecommunications services. Section 3 of the Communications Act defines telecommunications services to mean "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of facilities used." Under this reading, states may require all telecommunications carriers — including incumbent LECs, new LECs, CMRS providers, and IXCs — to share the costs incurred in the provision of currently available number portability arrangements. As discussed in greater detail below, states may apportion the incremental costs of currently available measures among relevant carriers by using competitively neutral allocators, such as gross telecommunications revenues, number of lines, or number of active telephone numbers.
FCC Order, ¶ 130, p. 68.
On November 20, 1996, the DPUC reopened the proceedings to investigate, inter alia, the status of implementation associated with number portability cost allocation recovery methodology ordered in the July 17, 1996 decision. (ROR, Item XII-2.) A number of entities participated in these proceedings, including the plaintiff and Airtouch Paging, the plaintiff in the companion appeal in this court. A public hearing was held on December 9, 1996 and concluded on January 9, 1997. A draft decision was filed on March 10, 1997. After written exceptions and oral arguments, CT Page 3422 on March 25, 1997, the final decision issued on how SNET would recover costs it incurs in providing number portability to other service providers and if the DPUC cost recovery method comports with FCC instructions:
 The Department has reopened this proceeding to specifically review and address the recovery of SNET's cost of providing SPLNP as ordered in the July 17, 1996 Decision. The Department concludes that CMRS providers are "relevant carriers" for purposes of this proceeding and, therefore, subject to inclusion in the recommended mechanism for recovery of SNET's SPLNP costs. The Department also concludes it cost recovery mechanism is competitively neutral and consistent with the tests and standards outlined in the FCC Order. Accordingly, the Department reaffirms its July 17, 1996 Decision in this docket and shall require all telecommunications carriers (i.e., LECS, CLECS, IXCs and CMRS providers) to be responsible for their proportionate share of SNET's SPLNP costs. Therefore, all CMRS providers will be assessed proportionate shares of the SPLNP development and deployment costs to be incurred by SNET using a cost allocation formula based on a carrier's number of active telephone numbers (or lines) relative to the total number of active telephone numbers (or lines) in SNET's service territory.
(ROR, Item XII-3, pp. 19-20.)
The plaintiff Bell Atlantic raises three grounds in its appeal from this DPUC order. lt argues that the order is arbitrary and capricious and unlawfully discriminates against CMRS providers; that it contravenes federal law; and that it constitutes an impermissible tax in violation of state statute. As to the first ground, Bell Atlantic claims that the DPUC misconstrued the applicable FCC order to conclude that CMRS providers are "relevant carriers," and that the cost recovery mechanism unlawfully discriminates against CMRS providers because it does not comply with the federal mandate that such cost assessments be competitively neutral. Bell Atlantic's argument on the second ground is that the decision violates federal law regarding state authority over CMRS providers; specifically, in addition to requiring reimbursement for a wireline service that does not benefit CMRS providers, the decision attempts to regulate the rates of and exert jurisdiction over CMRS providers. The final ground encompasses the argument that since there is no CT Page 3423 state statute authorizing the assessment on CMRS providers to reimburse SNET for the cost of the currently available portability measures the assessment is an unauthorized tax on CMRS providers.
A basic principle of administrative law is that the scope of the court's review is very limited.
 Our Supreme Court has established a firm standard that is appropriately deferential to agency decision making, yet goes beyond a mere judicial `rubber stamping' of an agency's decisions. Connecticut Light Power v. Dept. of Public Utilities Control, 219 Conn. 51, 57, 591 A.2d 1231 Woodbury Water Co. v. Public Utilities Commission, 174 Conn. 258, 260, 386 A.2d 232 (1978). Courts will not substitute their judgment for that of the agency where substantial evidence exists on the record to support the agency's decision, and where the record reflects that the agency followed appropriate procedures. Samperi v. Inland Wetlands Agency, 226 Conn. 579, 587 628 A.2d 1286 (1993); Lieberman v. State Board of Labor Relations, 216 Conn. 253, 262 579 A.2d 505 (1990); Baerst v. State Board of Education, 34 Conn. App. 567, 571, 642 A.2d 76, cert. denied, 230 Conn. 915 645 A.2d 1081 (1994).
(Internal quotation marks omitted.) Cabasquini v. Commissioner ofSocial Services, 38 Conn. App. 522, 525-26, cert. denied,235 Conn. 906 (1995). General Statutes § 4-183(j) in part provides:
 The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
As to questions of law, the Supreme Court has recently stated that the deferential standard does not apply to a court's review of an "agency's construction of a statute, which is a pure question of law, particularly when the question has not been CT Page 3424 subjected to prior judicial review." Connecticut Light PowerCo. v. Texas-Ohio Power, Inc., 243 Conn. 635, 644 (1998). Otherwise, deference is accorded to the agency's construction of the statute it is empowered to enforce by applying subsection (6) of General Statutes § 4-183(j) Id., 642. Here, the meaning of "relevant carrier" is one that benefits from interim number portability. Accordingly, the court need not review the DPUC's construction of this phrase.
Under General Statutes § 16-35 "any person, including but not limited to a company, town, city, borough or corporation aggrieved by any order, authorization or decision by the Department of Public Utility Control. . . may appeal therefrom in accordance with the provisions of section 4-183." Under General Statutes § 4-183, a person who is aggrieved may appeal pursuant to its provisions. The court finds that the plaintiff is aggrieved in that it has a specific personal and legal interest that has possibly been adversely affected. United CableTelevision Services Corp. v. Dept. of Public Utility Control,235 Conn. 334, 342-343 (1995). Here the DPUC's decision requiring all telecommunication carriers, including the plaintiff, to be responsible for a share of SNET's number portability costs may affect the plaintiff's financial interest adversely. Accordingly, Bell Atlantic has standing to bring this appeal.
The DPUC findings pertinent to the first issue of whether Bell Atlantic is a "relevant carrier" are as follows:
 The Department is of the opinion that the implementation of interim number portability by a carrier is wholly unrelated to the issue of whether its customers would benefit by the incumbent LEC's implementation of interim number portability. The availability and capability afforded by SPLNP facilitates competition amongst all service providers using the public switched network for some, or all, of its transmission needs. Accordingly, the Department considers that all parties interconnected with SNET's network will benefit by the incumbent LEC's implementation of interim number portability. While CMRS carriers have not been required by either this Department or the FCC to implement interim number portability, CMRS carriers will directly experience benefit from its deployment as wireline end-user customers migrate from the LEC (in this case SNET) to a wireless service provider. In this situation, that end-user's telephone number will be ported via SNET's SPLNP to the wireless provider. The Department is not persuaded by BANM's argument that CT Page 3425 it would not benefit from interim number portability and its contention that CMRS carriers would be subsidizing the wireline industry. BANM Brief, p. 6. As the above illustrates, wireless service providers will derive a direct benefit of having SPLNP as real market impediments to customer migration such as the need to change telephone numbers are reduced. Therefore, the Department dismisses BANM's arguments and considers it to be a relevant carrier for purposes of cost recovery.
(ROR, Item XII-3, p. 16.)
Bell Atlantic argues that the DPUC misconstrued and misapplied the federal law in finding that Bell Atlantic as a CMRS carrier was a relevant carrier for purposes of cost recovery for the interim number portability. The plaintiff claims that the DPUC incorrectly interpreted "relevant carriers" to include CMRS providers. The penultimate sentence of Paragraph 130 of the FCC Order clearly sets forth that states may require all telecommunication carriers, including CMRS providers, like the plaintiff, to share the costs of currently available number portability arrangements. FCC Order, ¶ 130, p. 68. The final sentence then refers to "all relevant carriers." The DPUC found that the CMRS providers are relevant carriers because they will benefit from the implementation of the interim number portability by SNET. The plaintiff Bell Atlantic does not challenge the criterion of "benefit" for determining who is a relevant carrier but challenges the DPUC's finding that CMRS providers will benefit from the interim number portability. The DPUC relies upon the findings of the FCC in its Order and presumably its own expertise.[2]
The DPUC relied on the FCC's determination that number portability will encourage competition between CMRS providers and wireline providers like SNET. Further, as noted previously, the FCC Order requires the LEC to provide interim number portability for customers who choose to leave the LEC for a wireless service provider. Thus, as noted by the DPUC, although the CMRS providers are not required to develop number portability they do receive the benefit of the service.[3] If the LEC was not required to provide number portability when a customer switched to a wireless provider, the plaintiff would have a stronger argument that it was not a "relevant carrier." Further, Congress in 47 U.S.C. § 251 and the FCC in its Order through number portability the facilitation of competition in thelocal exchange carrier environment. To include CMRS providers like Bell Atlantic in the definition of relevant carriers serves CT Page 3426 that goal since there is no question that CMRS providers participate in the local exchange market. Accordingly, the court will not disturb the finding of the DPUC that the plaintiff is a relevant carrier for purposes of cost recovery.
The plaintiff next argues that even if it is a relevant carrier, the DPUC unfairly discriminated against it in choosing a cost recovery system that is not competitively neutral. The DPUC determined that a cost allocation formula based on a carrier's number of active telephone numbers or lines relative to the total number of telephone numbers or lines in SNET's service territory is competitively neutral as mandated by the 1996 Telecommunications Act and consistent with the FCC Order. (ROR, Item XII-3, pp. 19-20.) The FCC Order establishes guidelines for implementing a cost recovery system with a competitively neutral basis. It first notes that this basis is a departure from the usual cost causation principles employed by the FCC because "[d]epending on the technology used, to price number portability on a cost causative basis could defeat the purpose for which it was mandated." (FCC Order, ¶ 131, p. 68.) The FCC then set forth two criteria for competitively neutral cost recovery: 1) it "should not give one service provider an appreciable, incremental cost advantage over another service provider when competing for a specific subscriber" and 2) it "should not have a disparate effect on the ability of competing service providers to earn normal returns on their investments." (FCC Order, ¶¶ 132, 135.) The DPUC applied these criteria and concluded that its cost recovery system was competitively neutral:
 These are the only tests and standards that can be applied in judging the merits of a proposed cost recovery mechanism. The Department remains of the opinion after this proceeding that its number portability cost recovery mechanism comports with the standards outlined in the FCC Order. During this reopened proceeding, the CMRS carriers offered no new evidence or argument which demonstrates that implementation of the Department's requirements produces an "appreciable cost disadvantage" vis-á-vis SNET, as SNET's end-use subscribers contemplate migration to a wireless provider for a local service. The Department also remains of the opinion that the previously authorized interim number cost recovery mechanism is competitively neutral because SNET's SPLNP costs will be recovered from all service providers based on the FCC's established criteria. This recovery mechanism recovers only SNET's SPLNP costs based on a uniform assessment of all telecommunications carriers' active Connecticut telephone numbers (or lines). In the Department's opinion, its number portability CT Page 3427 cost recovery mechanism satisfies the FCC's criteria because only SNET's cost of providing SPLNP service will be recovered from all relevant parties in a proportionate manner. Accordingly, as the size of any carrier's customer base changes, so will the proportionate assessment of SPLNP cost. Finally, the Department concurs with the FCC that recovery of interim number portability costs based on a per access line/telephone number basis would result in approximately equal per-customer costs to each carrier. On the basis of these considerations, the Department finds that its SPLNP cost recovery mechanism satisfies the FCC's requirement that it be competitively neutral.
(ROR, Item XII-3, p. 18.)
The plaintiff claims that the DPUC's finding as to the cost recovery mechanism is contrary to the second prong of the FCC's determination of competitive neutrality. It argues that because CMRS providers are not benefitting [benefiting] from the interim number portability, their ability to earn a normal return on investment is adversely affected by the imposition of the number portability costs. Since the court has approved the DPUC's finding of benefit to the CMRS providers, it rejects this argument. The court notes however that the record does not reveal when and how the assessment of costs is made. Further, the record and the DPUC's brief allude to the fact that SNET has not sought recovery of these costs. The lack of specific information in the record as to implementation of the cost recovery for the interim number portability limits this court to a consideration of the concept only.
The DPUC adhered to the FCC's mandate and in fact used a cost recovery mechanism expressly approved by the FCC. (FCC Order, ¶ 136.) The court finds there is substantial evidence to support the DPUC's determination that the cost recover mechanism comports with federal law.
Bell Atlantic also claims that DPUC violated federal law by imposing this assessment on CMRS providers as part of a cost recovery mechanism for a program that offers no benefit to CMRS providers. Bell Atlantic further argues that the DPUC is attempting to regulate the rates of and to exert jurisdiction over CMRS providers. The court has previously decided that the record supports a finding of benefit to the CMRS providers.
It is not disputed that federal law bars the DPUC from regulating the entry of or the rates charged by CMRS providers.47 U.S.C. § 332(c)(3)(A).[4] Nevertheless, the DPUC retains CT Page 3428 jurisdiction over intrastate telephone communication services, and over "other terms and conditions of commercial mobile services." See Iowa Utilities Board v. FCC, 120 F.3d 753, 796
(1997); Bell Atlantic NYNEX Mobile Inc. v. Connecticut Departmentof Public Utility Control, supra, Superior Court, Docket No. 555232, pp. 7-9. Here, the FCC has authorized the states to impose payments upon all telecommunications carriers to share in the costs of interim number portability. The cost recovery mechanism ordered by the DPUC is not rate making nor is it otherwise an invalid exercise of jurisdiction.
Finally, Bell Atlantic claims that the DPUC's decision imposes an impermissible tax on cellular telephone service providers in violation of state law. The DPUC acted pursuant to its authority under §§ 16-247a and 16-247b in approving the cost allocation formula SNET will utilize to charge the relevant telecommunication carriers for its number portability services.
Contrary to Bell Atlantic's assertion, Bell Atlantic's contribution for SNETs developmental and deployment costs for number portability does not constitute a tax; rather, it is a charge for services. A tax, on the other hand, is imposed for the benefit of the state or the general public. Bidart Bros. v. TheCalifornia Apple Commission, 73 F.3d 925, 932 (9th Cir. 1996); seeState v. Lytwyn, 27 Conn. Sup. 74, 78 (1967).
Metro Mobile CTS v. DPUC, judicial district of Hartford/New Britain at Hartford, Docket No. 51275 (18 C.L.Reptr. 355, December 11, 1996), upon which Bell Atlantic relies, is distinguishable because it did not involve a charge for services rendered by one telecommunication carrier to another. The plaintiff cellular service providers in Metro Mobile challenged the propriety of assessments imposed upon cellular service providers to fund two state programs designed to directly assist certain businesses and the residents of this state. The charges approved in the present case are not intended to benefit a state agency or program nor will the monies be paid into state coffers.Bidart Bros. v. The California Apple Commission, supra, 73 F.3d 932. Rather, the charges will be paid to SNET for the number portability services it renders to other telecommunication carriers. It was not improper for the DPUC to direct cellular service providers to contribute to SNET's developmental and deployment costs for number portability.
The appeal is dismissed. CT Page 3429
DiPentima, J.