**DISTRICT OF COLUMBIA, Appellant,**

v.

**BROOKSTOWNE COMMUNITY DEVELOPMENT COMPANY, Appellee.**

No. 08–CV–264.

District of Columbia Court of Appeals.

Argued Oct. 28, 2009.

Decided Jan. 21, 2010.

James C. McKay, Jr., Senior Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellant.

Savalle C. Sims, Washington, with whom Eric S. Baxter was on the brief, for appellee.

Before WASHINGTON, Chief Judge, REID, Associate Judge, and PRYOR, Senior Judge.

WASHINGTON, Chief Judge:

The District of Columbia appeals from a judgment entered against it for breach of a contract to sell, pursuant to the District's Homestead Program created by the Homestead Housing Preservation Act of 1986 ("HHPA"), D.C.Code § 45–2701 et seq. (1996),[1] a multi-family residential apartment building to Brookstowne Community Development Company ("Brookstowne"), a for-profit entity. On appeal, as before the trial court, the District contends that the HHPA prohibits such sales of property to for-profit entities, so it could not have entered into the Brookstowne contract as a matter of law, and the contract is therefore void and unenforceable ab initio. We hold that the HHPA does not authorize the District to sell property to for-profit entities under the Homestead Program,[2] and that the District cannot be estopped from disavowing the Brookstowne contract on that basis. Accordingly, we reverse.

I.

As discussed in greater detail below, the HHPA was enacted to provide the District with a method—in the form of the Homestead Program, administered by the Department of Housing and Community Development ("DHCD")—of developing decaying properties into low and moderately priced family housing while supporting local community development entities. See D.C.Code § 45–2702; and COUNCIL OF THE DISTRICT OF COLUMBIA, REPORT OF THE COMMITTEE ON HOUSING AND ECONOMIC DEVELOPMENT FOR THE "HOMESTEAD HOUSING PRESERVATION ACT OF 1986" at 3 (May 7, 1986) [hereinafter D.C. COUNCIL REPORT]. In keeping with the purpose of the HHPA, in the Spring of 1998, the DHCD issued a request for proposals ("RFP") soliciting buyers to renovate into affordable condominiums a thirty-seven unit multi-family residential apartment building, located at 1831 2nd Street, N.E.[3] The RFP laid out the following order of preference and priority to be applied to submitted proposals:

Proposals from tenant associations in occupied buildings will be given first consideration.

If no proposals are received from the tenant associations (or if the building is vacant), proposals from cooperative housing associations and/or individuals forming a condominium association will be considered next.

If no proposal falls within the above categories, next consideration will be given to proposals received from non-profit development companies.

If no proposals are received from a non-profit developer, proposals from other entities will be considered.

---

1. The HHPA was recodified and amended in 2001. D.C.Code § 42–2101 et seq. (2001). However, all events and transactions relevant to this appeal were subject to the 1996 version of the HHPA, so all citations are to that version.

2. The 2001 version of the HHPA has been amended to permit some transfers of property to certain for-profit entities, see D.C.Code § 42–2106, but the Brookstowne contract predates that 2002 amendment, which is consequently not applicable here.

3. The RFP listed several dozen other properties as well.

In response, Brookstowne submitted a proposal for the apartment building in July 1998, which stated that Brookstowne was a sole proprietorship.

On August 6, 1998, DHCD sent a letter to Brookstowne accepting its proposal and selecting it to develop the property at issue. The letter stated that the purchase price for the property was $9,250, and continued: "If you wish to accept this offer, a $250 deposit must be paid ... to the District of Columbia Treasurer, no later than Thursday, August 20, 1998, at 4:00 p.m., at the Homestead Program Administration...." It then listed the obligations the developer was subject to regarding the building, and stated that "[c]losing must take place no later than Wednesday, September 30, 1998." Brookstowne interpreted this letter as an offer, and paid the $250 deposit to accept. Several other proposals were submitted for the property, but according to the District's response to interrogatories, only Brookstowne's was deemed acceptable.

The closing was delayed past September 30, 1998, when the District failed to convey an unencumbered title because the Water and Sewer Authority ("WASA") held liens on the property. Between January 1999 and early 2003, the District negotiated with WASA to have the liens removed, and

having succeeded by early 2003, began to prepare closing documents in May 2003, nearly five years after Brookstowne's initial proposal submission. However, the closing documents, which were originally dated September 1998 but which Brookstowne did not see until May 2003, incorrectly indicated that Brookstowne was a non-profit entity. Brookstowne informed the District of the error, which was corrected. Both parties then signed the documents.

On December 23, 2003, DHCD sent a letter to Brookstowne withdrawing the offer to sell the property and refunding the $250 deposit because Brookstowne's for-profit status had come to light.[4] In response, on June 6, 2004, Brookstowne brought suit in the Superior Court on a breach of contract theory, seeking specific performance and damages. The District moved for summary judgment, arguing that the HHPA precluded sales to for-profit entities, so DHCD lacked the statutory authority to enter into the alleged contract. The trial court denied the District's motion, reserving judgment at that time on the issue of capacity to contract, because it felt there were disputed material questions of fact necessitating a trial.

At trial, in addition to testimony and other evidence that DHCD held itself out

---

4. The letter stated, in pertinent part:

During the long process of clearing liens ... it was discovered that at the time [DHCD] made the offer ... to Brookstowne, your organization was a for-profit development organization. Unfortunately, at the time Brookstowne submitted its proposal to the Department and ... extension of the offer on August 6, 1998, for-profit developers were not eligible to participate in the Homestead Program. Therefore, there was no legal authority upon which the Department could enter a valid contract with Brookstowne for the receipt of this property pursuant to the Homestead Housing Preservation Program.

Additionally, the [WASA] liens that were eventually released from the property in March 2003 were released based on the representations by [DHCD] that the property would be developed by a non-profit entity, which was in accord with Homestead Program's requirement. WASA has stated, during the negotiations to release the liens, that "[I]f the property is sold within the next ten years to a for-profit entity, the current balance due will become due concurrent with the property sale, in addition to all applicable late fees and penalties." Unfortunately, it was not realized until recently that Brookstowne, as a for-profit developer, was not eligible to participate in the program under any circumstances.

as having the authority to sell property to for-profit entities and knew that Brookstowne operated for profit, Brookstowne introduced a Homestead Program brochure that expressly listed "for-profit developers" in its order of proposal priority. However, Lynn French, the Administrator of the Homestead Program from 1987 to 2001, testified for the District that she would have rejected Brookstowne's proposal had she noticed that it was a for-profit entity, but this information did not "jump out" at her. However, she also admitted that she did consider for-profit entities under the Homestead Program, but as a lowest priority. The District's responses to interrogatories further stated that its "position [is] that it has the authority to transfer the subject property to a for-profit developer."

While the trial court never made an explicit final ruling on the threshold issue of whether DHCD had the statutory capacity to contract with Brookstowne, it did conclude that DHCD had breached its contract to sell the apartment building to Brookstowne and ordered the District to pay $1,395,365.18 in damages. Judgment was entered against the District on November 28, 2007. This timely appeal followed.

## II.

We are presented with the question of whether the HHPA permits sales of property to for-profit entities and, if not, whether the District can be estopped from denying the enforceability of a contract on that basis. The District contends that the plain language of the HHPA clearly denies it the authority, and therefore the capacity, to contract to sell property to for-profit entities under the Homestead Program. This is supported, according to the District, by the HHPA's legislative history. In response, Brookstowne argues essen-

tially that the District should be estopped from denying its authority to contract with for-profit entities under the HHPA, that nothing in the HHPA prohibits such sales, and that DHCD regulations expressly allow for "other entities." We address the statutory interpretation and estoppel issues in turn.

■ As we have noted many times, "[w]e review *de novo* the trial court's legal conclusions and any issues of statutory construction," *Mitchell v. United States,* 977 A.2d 959, 968 (D.C.2009), and "[t]he determination whether an enforceable contract exists ... is a question of law," *Rosenthal v. National Produce Co.,* 573 A.2d 365, 369 n. 9 (D.C.1990). We therefore review *de novo* the trial court's conclusion that the contract was enforceable; the "clearly erroneous" standard of review does not apply. *See L.K. Comstock & Co. v. United Engineers & Constructors, Inc.,* 880 F.2d 219, 221 (9th Cir.1989) ("[F]actual findings as to what the parties said or did are reviewed under the 'clearly erroneous' standard, while principles of contract interpretation applied to the facts are reviewed de novo."); *United States v. John McShain, Inc.,* 258 F.2d 422, 103 U.S.App. D.C. 328, 330–31 (D.C.Cir.1958), *cert. denied,* 358 U.S. 832, 79 S.Ct. 52, 3 L.Ed.2d 70 (1958).

### A.

■ A contract is void or voidable if one of the parties lacked the capacity to enter into it. *See* CORBIN ON CONTRACTS § 1.4(2), at 1–9 (Desk ed.2009) (hereinafter CORBIN). For government agencies, the extent of the capacity to contract is determined by the scope of their statutorily granted authority. *Id.* § 27.01, at 27–28 ("Artificial persons such as ... government agencies [a]re traditionally limited to the powers conferred on them by the government that created them. Any attempt

by them to contract beyond their conferred powers would be an *ultra vires* act that would be unlawful and the artificial person could raise its lack of capacity to contract on that basis."). As such, "[i]t is a basic principle of District law that a contracting official cannot obligate the District to a contract in excess of his or her *actual authority*." [5] *District of Columbia v. Greene,* 806 A.2d 216, 222 (D.C.2002) (emphasis added).

Here, the District's authority to contract with Brookstowne pursuant to the Homestead Program is limited to that provided by the HHPA, the enabling statute. As worded at all times relevant to this appeal, the pertinent section of the HHPA, § 45–2706, which is entitled "Program Guidelines," provides the Homestead Program's priority order for transferring large multi-family residential buildings: [6]

(a) Proposals for large multi-family dwellings shall be considered only in accordance with the following rules of priority:

(1) A proposal from a qualified tenant association shall be considered first.

(2) If there is no proposal from a qualified tenant association or if the proposal does not meet the criteria set forth in the RFP and rules promulgated pursuant to this act, proposals from cooperative housing associations shall be considered next.

(3) If there are no proposals from cooperative housing associations or if the proposals do not meet the criteria set forth in the RFP and rules promulgated pursuant to this act, proposals from nonprofit developers for the development of cooperative housing opportunities shall be considered next.

No mention is made of for-profit entities, and the District emphasizes that the use of the word "only" precludes consideration of any entities not listed thereunder. Brookstowne, however, notes that the statute refers only to a priority order for consideration of proposals, and does not "by its plain language ... bar for-profit entities from participating in the Homestead Program. It merely requires that proposals from certain entities be given first priority."

It is axiomatic that "when the language [of a statute or regulation] is unambiguous and does not produce an absurd result [the court] will not look beyond its plain meaning." *Citizens Ass'n of Georgetown v. District of Columbia Bd. of Zoning Adjustment,* 642 A.2d 125, 128 (D.C.1994). "Moreover, we construe the words of the statute 'according to their ordinary sense and with the meaning commonly attributed to them' *Davis v. United States,* 397 A.2d 951, 956 (D.C.1979)." *Lennon v. United States,* 736 A.2d 208, 210 (D.C.1999). We will not add language to a statute, because "[t]o supply omissions transcends the judicial function." *Allman v. Snyder,* 888 A.2d 1161, 1169 (D.C.2005). Finally, the statutory construction canon *expressio un-*

---

**5.** For example, in *RDP Development Corp. v. District of Columbia,* 645 A.2d 1078 (D.C. 1994), the intended purchaser of a property from the District sued for specific performance and damages after retroactive emergency legislation requiring new competitive procurement procedures was enacted five days after the contract to sell was entered into, and the District accordingly did not perform. *Id.* at 1078. Because the statutory authority of the District to sell the property was retroactively modified by the emergency legislation, such that procedures for the sale were not followed, this court affirmed the trial court's award of summary judgment in favor of the District. *Id.* at 1082. As a matter of law, the District could not have entered into the contract. *Id.*

**6.** There is no dispute that the property at issue in this case is a large multi-family residential building.

*ius est exclusio alterius* informs us that when a list is enumerated it may be presumed to be exhaustive unless otherwise provided. *See Council of D.C. v. Clay*, 683 A.2d 1385, 1390 (D.C.1996). However, this Latin canon "must ... be subordinated to 'clear and contrary evidence of [legislative] intent.' " *Id.* In sum, the intent of the statute and its enacting legislative body control.

While Brookstowne is correct that § 45–2706 of the HHPA refers only to "consideration" and an order of priorities and does not explicitly exclude for-profit entities, we note that "consideration" of a proposal by DHCD is a logical predicate to its acceptance into the Homestead Program. A developer's proposal cannot be accepted unless it is first considered, and it can "only" be considered in the order of priorities mandated by the statute. Thus, the statute does not need to explicitly preclude for-profit developers from being eligible to have their proposals accepted because it precludes them from even being considered. The preclusion is inherent in the carefully enumerated hierarchy of entities that may be considered: tenant associations, then cooperative housing associations, and finally, non-profit developers of cooperative housing associations. Critically, the use of the word "only"—the plain meaning of which is "[s]olely; merely; for no other purpose; ... of or by itself; without anything more; exclusive; nothing else or more," BLACK'S LAW DICTIONARY 1089 (6th ed.1990)—is very nearly disposi-

tive evidence that the Council intended *only* those entities enumerated to be eligible for consideration. The exclusion of for-profit developers from the list of those entities that can be even considered strongly suggests that the District lacked the authority to sell the property to Brookstowne under the HHPA. Thus, on the basis of the use of the word "only" and the enumeration of a list we must presume to be exhaustive, we are satisfied that the plain meaning of the statute limits DHCD's capacity to contract under the Homestead Program to contracts with entities that are non-profit.

■ Even were we to agree with Brookstowne that § 45–2706 of the HHPA, on its face, is susceptible to different interpretations and therefore that there is some measure of ambiguity in this provision, the legislative history of the HHPA supports our conclusion that DHCD was not authorized to contract with for-profit entities under the Homestead Program. When the plain language of a statute is clear, we look no further to ascertain its meaning, but when it "defies straight forward interpretation" we "look to secondary sources, such as legislative history...." *Washington Gas Light Co. v. PSC of the D.C.*, 982 A.2d 691, 702 (D.C.2009).[7] Here, the D.C. Council Report that was prepared by the Committee on Housing and Economic Development regarding the HHPA clearly states that "[o]nly individuals, co-operative housing associations and non-profit devel-

7. Under normal circumstances, we will also "defer to an agency's reasonable interpretation of an ambiguous statute the legislature has charged the agency with administering...." *See Washington Gas Light Co., supra*, 982 A.2d at 703. In this case, however, DHCD contradicted its own interpretation of the HHPA repeatedly, first issuing a RFP that mentioned "other entities," then revoking the offer to Brookstowne because its for-profit status rendered it ineligible for the Home-

stead Program, then stating in interrogatories that it had the power to sell Homestead Program properties to for-profit entities, then offering Lynn French's testimony that she would have denied Brookstowne's proposal if she had known it was a for-profit entity. Consequently, without addressing the reasonability of the agency interpretation in this case, we find no consistent DHCD interpretation of the HHPA to defer to.

opers who wish to assist in the organization of a co-operative housing association may seek to acquire the properties." D.C. COUNCIL REPORT, *supra* at 3 (emphasis added). Thus, even assuming that the plain meaning of § 45–2706 is not obvious on its face, we are satisfied that this clear expression of legislative intent found in the D.C. Council Report fills in the ambiguity, if any, in this provision of the HHPA.

■ Notwithstanding the fact that § 45–2706 of the HHPA limits participation in the Homestead Program to non-profit entities, Brookstowne contends that DHCD regulations enacted pursuant to the HHPA effectively amended the HHPA and permit DHCD to consider "[p]roposals from *other entities* to develop cooperative housing," which "shall be considered only if there are no qualified proposals from the categories listed." 14 DCMR § 2907.2 (1987) (emphasis added). Brookstowne argues that the language "other entities" in the DHCD regulation clearly anticipates entities like itself, and the regulation thereby authorizes DHCD to contract with it after finding no other proposals acceptable, which the District admitted during discovery was what happened in this case.

■ Because § 45–2706 of the HHPA limits participation in the Homestead Program to non-profit entities, agency-developed regulations that are inconsistent with the legislation's mandate are invalid. The Homestead Program regulations were enacted under a directive in § 45–2704 of the HHPA, which mandated that the Administrator of DHCD "formulate standards consistent with this act for participation in the [Homestead] Program." Agencies are creatures of statute and their authority and discretion are limited to that which is granted under their founding statutes. Therefore, regulations they enact pursuant to that statutorily provided authority cannot expand that authority. *See, e.g., Han-*son *v. District of Columbia Rental Hous. Comm'n,* 584 A.2d 592, 595 (D.C.1991) ("[I]f an agency's regulation is invalid— *i.e.,* in conflict with the statutes, beyond the statutory authority of an agency, or violates jurisdictional doctrines—the agency is not bound by its regulations and its decision to depart from the regulations will be upheld.") (citations omitted); *Barbour v. District of Columbia Dep't of Employment Servs.,* 499 A.2d 122, 125–26 (D.C. 1985) (interpreting the term "labor dispute" in a regulation so as not to permit the regulation to "eviscerate congressional intent by promulgating ... [inconsistent] regulation."); *District of Columbia v. Catholic Univ. of Am.,* 397 A.2d 915, 915 (D.C.1979) (striking down a tax regulation that violated the D.C. Real Property Tax Revision Act of 1974).

Here, the HHPA permits consideration *only* of non-profit entities for participation in the Homestead Program, and therefore, DHCD was without authority to promulgate rules that expanded the list of entities eligible for consideration to include for-profit entities. *See* D.C.Code § 45–2704(c) (authorizing regulations "consistent with this act for participation in the Program"). Thus, the "other entities" language in the DHCD regulation must be read to conform to the express purpose of the HHPA, which authorizes the sales of Homestead Program properties only to non-profit entities.

**B.**

■ Remaining is the question of whether the District can be estopped from disavowing the Brookstowne contract when it knew, or constructively knew, that Brookstowne was a for-profit entity before entering into the contract, and when it held itself out as having the authority to sell properties to for-profit entities under the Homestead Program. The trial court

held that the District was bound by its own representations, but the District essentially argues that estoppel cannot be applied against the government, and that persons contracting with the District are on constructive notice as to the limits of its authority and cannot claim to have been detrimentally misled. Brookstowne counters by arguing that discovery rules bind the District to its admissions that it had the authority to contract with the for-profit company.

 "[T]o successfully raise an estoppel argument against the District, [an] appellant 'must show that the District made a promise, that [it] suffered injury due to reasonable reliance on the promise and that enforcement of the promise would be in the public interest and would prevent injustice.'" *Hospitality Temps Corp. v. District of Columbia*, 926 A.2d 131, 139 (D.C.2007) (quoting *District of Columbia v. McGregor Properties, Inc.*, 479 A.2d 1270, 1273 (D.C.1984)). However, "the doctrine of equitable estoppel, if applicable against the government at all, may be invoked only where there is a showing of some type of affirmative misconduct by a government agent." *See, e.g., Mamo v. District of Columbia*, 934 A.2d 376, 386 (D.C.2007) (quoting *Leekley v. District of Columbia Dep't of Employment Servs.*, 726 A.2d 678, 680 (D.C.1999)).

 Importantly, we have held that when the agent of the government whose representations are relied upon plainly lacks the authority to do whatever he has promised, the promisee's reliance cannot be "reasonable." *See, e.g., Mamo, supra*, 934 A.2d at 386. This is because "a person making or seeking to make a contract with the District is charged with knowledge of the limits of the agency's (or its agent's) actual authority.... [A] party contracting with the government is 'on constructive notice of the limits of the [government

agent's] authority,' and cannot reasonably rely on representations to the contrary." *Greene, supra*, 806 A.2d at 222 (internal citations omitted).

Here, even assuming that Brookstowne could make a showing that enforcement of the contract would be in the public interest and would prevent injustice—which it did not attempt to do—it was on constructive notice that the District lacked the authority to transfer the property to a for-profit entity. While Brookstowne did present evidence, which the trial court found credible and persuasive, that the District engaged in at least passive misconduct, Brookstowne's reliance on DHCD's claims to have the necessary authority cannot be "reasonable" as matter of law under our holding in *District of Columbia v. Greene, supra*, and other similar cases. The HHPA clearly provides that only the three enumerated categories of non-profit entities are eligible for consideration under the Homestead Program, so it was not reasonable for Brookstowne to rely on any assertions by DHCD to the contrary because "a person making ... a contract with the District is charged with knowledge of the limits of the agency's (or its agent's) actual authority." *Id.* As such, Brookstowne has failed to successfully raise an estoppel claim against the District, even assuming affirmative misconduct on the part of DHCD.

### III.

In summary, we hold that the HHPA did not authorize the DHCD to contract to sell the apartment building to a for-profit entity under the Homestead Program, so the agency lacked the capacity to enter into the Brookstowne contract, which is therefore void *ab initio*. Moreover, the District cannot be estopped from denying the enforceability of the contract because the facts in this case fail to reach the very

high threshold required for estoppel to be applicable against the government. Accordingly, we reverse, and order that judgment be entered for the District.

*So ordered.*